In re WEISS–WOLF, INC., Debtor.

WEISS–WOLF, INC., Plaintiff,

v.

ISRAEL DISCOUNT BANK LIMITED, Union Bank of Israel, Ltd., and Bank Leumi Le-Israel, B.M., Defendants.

Bankruptcy No. 82 B 10935.
Adv. No. 82–5890–A.

United States Bankruptcy Court,
S.D. New York.

May 30, 1986.

Marvin Neiman, New York City, for the debtor; Marvin Neiman, Theodore Mairanz, and Moshe Z. Mirsky, of counsel.

Proskauer Rose Goetz & Mendelsohn, New York City, for defendants; Steven Stein, John Woodward, of counsel.

PRUDENCE B. ABRAM, Bankruptcy Judge:

Weiss-Wolf, Inc. ("Debtor" or "Weiss-Wolf"), the debtor and debtor-in-possession in this Chapter 11 case commenced on May 19, 1982, is a New York corporation which has in the past been engaged in the business of buying, selling and manufacturing diamonds. On July 21, 1982, the Debtor commenced this adversary proceeding against the three defendants, Israel Discount Bank Limited ("IDB"), Union Bank of Israel, Ltd. ("UBI"), and Bank Leumi Le-Israel, B.M. ("Leumi") (collectively the "Banks").[1] The Banks are banking institu-

---

1. UBI is a wholly-owned subsidiary of Leumi. There being nothing in the matter before the court that separates UBI from Luemi, the two banks together are referred to as UBI in the balance of this opinion.

tions with offices located in both New York and Israel who had been lenders to Weiss-Wolf, Limited ("Limited"), the Debtor's Israeli affiliate, which is presently in liquidation proceedings in the District Court of Tel Aviv, Israel and under the control of the official receiver of the State of Israel.[2] The Debtor's amended complaint filed November 4, 1982, has five "claims."[3] The first count seeks a turnover from UBI pursuant to Bankruptcy Code § 542 of certain diamonds, alleged to have a value of $1.7 million, in IDB's possession which are alleged to have been sent on consignment by the Debtor to Limited during the period 1979–1981. The complaint states that IDB

"with full knowledge of the circumstances of Limited's acquisition of the diamonds, accepted said diamonds from Limited to be used as collateral for an extension of credit to Limited."

The second count is identical to the first except that it is directed at UBI and alleges the diamonds sought to be turned over are valued at slightly in excess of $2.5 million. The third count alleges that IDB on various dates during the period 1979 through 1981 converted to its own use diamonds belonging to plaintiff which were valued at approximately $4.1 million at the time of conversion. The fourth count is identical to the third except that it is directed at UBI. The fifth count alleges that the three banks have joined in a conspiracy to share the proceeds of their conversions of the diamonds alleged to belong to the Debtor. On the fifth count the Debtor seeks actual damages of $4.1 million in addition to punitive damages of $1 million.

In their answer, the Banks responded to the first two counts by admitting to still having certain diamonds (hereafter the "Diamonds")[4] received in pledge from Limited. They denied knowledge or information sufficient to form a belief as to whether the Diamonds were the Debtor's in the absence of any identification by the Debtor of the diamonds as to which it was seeking turnover. As to counts three and four, the Banks denied converting any diamonds belonging to the Debtor to their own use. The Banks also denied count five which had alleged a conspiracy relative to conversion of diamonds. UBI asserted lack of personal jurisdiction as a defense. As a second defense, the Banks alleged that the officers, directors or employees of the Debtor and Limited who engaged in dealings with the Debtors had the actual or apparent authority to do so. As their third defense, the Banks alleged that under applicable law, the ownership of the diamonds was irrelevant to the Banks' right of possession and disposition of diamonds delivered to them by Limited to collateralize Limited's obligations.

On July 8, 1983, the Debtor filed a motion, based on an affidavit of counsel, in which it sought preliminary relief in the form of an order directing that the Banks turn over the Diamonds to the Debtor or to the court pending final determination of the adversary proceeding. The Debtor alleged that the Banks had moved in Israel in the Limited receivership proceeding for an order authorizing the sale of the Diamonds.

Thereafter and on August 16, 1983, the Banks filed a cross-motion for an order

---

**2.** The Banks are represented by the same counsel. However, the IDB and UBI transactions, although similar in pattern, are unrelated.

**3.** Federal Rule of Civil Procedure 10(b), make applicable by Bankruptcy Rule 7010, provides: "Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate *count* or defense whenever a separation facilitates the clear presentation of the matters set forth." (Emphasis added).

**4.** The Diamonds consist of the following: UBI has one package containing two brifskas of

rough diamonds containing 28 stones totalling 222.29 carats and another package containing two brifskas of rough diamonds containing 15 stones totalling 205.37 carats. Both of these packages were pledged on March 17, 1982. There is also a third UBI package consisting of a 32.15 carat polished diamond (the "Stone") which was pledged on February 10, 1982. The parcels IDB has have been identified by parcel number, rough or polished, date of deposit and appraisal value in the IDB's August 19, 1983 affidavit. All of the Diamonds other than the Stone will be hereafter referred to as the "Parcels."

granting summary judgment dismissing the adversary proceeding and also opposed the Debtor's motion. The summary judgment motion is supported by three affidavits, one from the Senior Manager of IDB, one from the Assistant General Manager of UBI and one from an attorney for the Banks which authenticates the accompanying exhibits consisting principally of deposition transcripts. The Banks' main position is that the Debtor is estopped from claiming any rights in the diamonds pledged by Limited superior to those of IDB and UBI. The Banks also urge that this court lacks jurisdiction to enter an order directing delivery of the diamonds because the Israeli receiver for Limited has not been named as a party. The Banks filed a supporting memorandum of law.

The Debtor has opposed the Banks' cross-motion for summary judgment in the form of a lengthy affidavit from an attorney for the Debtor which incorporates both factual and legal arguments. An affidavit from Isaac Wolf, a shareholder and officer of the Debtor, has also been submitted. It is the Debtor's position that material facts are in dispute. Subsequent to oral argument on the Debtor's motion and the Banks' cross-motion, the Debtor submitted a supplemental affidavit requesting that the summary judgment motion be denied until the Debtor had discovery of the Banks' records with regard to the identity of the diamonds in their vaults.

The fortunes of Weiss-Wolf and Limited had suffered major reverses by early 1982 at least in part because of a substantial and world-wide decline in the price of diamonds. This adversary proceeding is but one of many actions, both civil and criminal, in a number of different courts resulting from Limited's failure to repay the Banks and from the guarantees of Limited's debt alleged to have been given by Messrs. Weiss and Wolf and the Debtor.[5] The present adversary proceeding does not concern either the validity of any guarantee given by the Debtor or the amount or allowability of any claim of the Banks in this case.

Limited, which was engaged in a similar business to that of Weiss-Wolf, obtained financing for its operations by borrowing from the Banks secured by the pledge of diamonds. UBI has alleged that it was owed over $6 million by Limited as of March 1982. As of April 1982, IDB has alleged that it was owed approximately $5 million by Limited.[6]

Limited's banking relationship with IDB began in January 1980. An "Agreement of Undertaking" was executed in which IDB agreed to grant loans and extend credit to Limited in order to finance Limited's diamond business. At the same time, the parties also executed a "General Agreement Regarding Mortgage and Lien of Merchandise"[7] pursuant to which it was agreed that any loans would be collateralized by diamonds pledged by Limited. In

---

5. IDB and UBI have each instituted suits in the Supreme Court of New York, New York County, and in the Southern District of New York against Messrs. Weiss and Wolf as guarantors of the loans made to Limited. Those suits have been marked by extensive discovery both here and in Israel. Among the many depositions which have been taken in these suits have been those of Irving Weiss; Isaac Wolf; Mendel Kresch, a former employee of the Debtor; Benjamin Oshman, assistant general manager of UBI; and Raymond Darwish, senior manager of IDB. Although Mr. Wolf appeared for a deposition in the action to recover on his guarantee, he decided, upon the advice of counsel, to assert his Fifth Amendment privilege against self-incrimination, as he asserts criminal charges in Israel are presently pending against him. The parties have both drawn extensively on discovery taken in other cases in presenting the present matter for decision.

6. The exact amounts of Limited's unpaid obligations to the Banks are disputed by the Debtor. However, the amounts are not material to this proceeding.

7. Both the "Agreement of Undertaking" and the "General Agreement Regarding Mortgage and Lien of Merchandise" were written in Hebrew. IDB has submitted translations of the documents by two translators. Although the Debtor has complained about the credentials of one of the translators, the Debtor has offered no other translations, pointed to no inaccuracies and has not stated any reason why it could not offer its own translations. A comparison of the two translations does not reflect any substantive difference. The court therefore accepts the translations as accurate.

the following month, February 1980, Limited entered into similar loan and pledge agreements [8] with UBI.

Each of the pledge agreements provided that Limited, the pledgor, would pledge only diamonds that it owned, free of any adverse interest or claim.[9] The arrangements with the Banks provided that Limited could withdraw packets in trust from the collateral pool so that the diamonds could be shown and sales made and would thereafter redeposit the unsold diamonds or remit the sales price. Such withdrawals are routine in the diamond banking business.[10] Most, if not all, of the diamonds pledged by Limited to the Banks were deposited by Moshe Reich, an agent and employee of Limited. Reich was empowered to act on behalf of Limited pursuant to the terms of a written power of attorney executed by Limited and it is undisputed that Reich had authority to act on behalf of Limited.[11] When it pledged a particular parcel of diamonds to the Banks, Limited signed a deposit ticket which stated, *inter alia*, that the deposit was made in accordance with the loan and pledge agreements.[12]

**8.** These documents too were written in Hebrew. Certified translations have likewise been provided to the court by the Banks.

**9.** Specifically, paragraph 6 of the IDB pledge agreement provided:
"The Mortgagers [sic] declare and commit themselves that the merchandise that will be submitted and that will be mortgaged or that will be a lien by them for the benefit of the Bank shall be in their ownership and in their exclusive possession, free of any lien, mortgage, foreclosure, right, claim or dispute of any sort whatsoever on the part of any individual or individuals * * *" From the Berlitz Translation Service translation.
The UBI pledge agreement similarly provides in paragraph 6(a):
"As surety for payment of any principal debt, interest, service charges, exchanges and expenses due the Banks from us in the above credit account, we will mortgage to the Banks and their representatives from time to time diamonds of the type, kind, quantity, and quality that the Banks or one of them agree to accept (the above diamonds shall hereinafter be called "the merchandise"). Transfer of the merchandise, postal receipts and/or other documents regarding the ownership of the merchandise by us to the Banks or one of them, their agents abroad or in Israel, shall be considered as the transfer of the merchandise by us to the Banks to actualize the mortgage and no other declaration or action shall be necessary in order to lend legal force to the above mortgage. So too, it is hereby granted, by virtue of the actual merchandise, postal receipts and/or other documents of ownership of the merchandise by the Banks or one of them or their agents, shall serve as definitive proof that the merchandise is mortgaged to the Banks in accordance with the terms of this Undertaking."

**10.** Subsequent to the complete submission of the motions, the Debtor has made various submissions by letter to the court respecting scandals on the Israeli diamond banking community which it alleges show bad faith on the part of the Banks. It appears from the Debtor's submissions that certain diamond merchants withdrew pledged packets of diamonds in trust for the purpose of showing them for sale. Rather than terminating the trust by returning the packet at the agreed time or making payment of the sales proceeds to the bank, the merchant repledged the packet to the bank for a new loan. The effect of this was to enable the merchant to use the same collateral twice. It is evident that the bank would then be in a position where the value of the collateral held by it was less than the loans made against it. This may have occurred with respect to Limited and raises legal issues which are among the subjects of the various litigations among the Debtor, Messrs. Weiss and Wolf, Limited and the Banks. However, the issue has no relevance to the present adversary proceeding which is concerned only with the Diamonds which the Banks now hold, or with respect to alleged acts, i.e., conversion, with respect to diamonds the Banks held in the past. Likewise irrelevant is the fact that Mr. Darwish, whose affidavit on behalf of IDB has been submitted in support of the summary judgment motion, has been indicted in Israel for irregularities in the operation of the trust system. The Debtor fails to recognize that the present action is not concerned with diamonds the Banks should but do not have, which is the trust receipt problem, but with diamonds the Banks do or did have.

**11.** As discussed *infra,* both Messrs. Weiss and Wolf deny a working knowledge of written or spoken Hebrew. However, there has been no allegation that Moshe Reich, the resident manager of Limited's business, was not fully fluent in both written and spoken Hebrew.

**12.** The UBI deposit ticket provides in relevant part:

Merchandise Owner's Agreement
"We deposit in your hands this parcel of diamonds which will be mortgaged to you as security for our debts, in accordance with the

For the reasons which follow, the court has determined that the Debtor's motion for turnover of the Diamonds should be denied and that the Banks' motion for summary judgment in their favor should be granted.

## DISCUSSION

*Summary Judgment Standards*

■■■ Summary judgment is appropriate only when "there is no genuine issue as to any material fact and * * * the moving party is entitled to judgment as a matter of law." *Federal Rules of Civil Procedure 56(c).*[13] See also *In the Matter of Iota Industries, Inc.,* 35 B.R. 693, 695 (Bankr.S. D.N.Y.1983); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980); and *Grand Union Co. v. Cord Meyer Development Corp.,* 735 F.2d 714, 717 (2d Cir.1984). It is the burden of the party who seeks the grant of summary judgment to demonstrate "the absence of any material factual issue genuinely in dispute." *In re Tampa Chain Company, Inc.,* 35 B.R. 568, 573 (Bankr.S.D.N.Y. 1983). *See also United States v. One Tintoretto Painting,* 691 F.2d 603, 606 (2d Cir.1982); *Quinn v. Syracuse Model Neighborhood Corp., supra.* In determining whether to grant a summary judgment motion the court "must resolve all doubts in favor of the party opposing the motion." *In the Matter of Iota Industries, Inc.,* 35 B.R. at 695 (Bankr.S.D.N.Y.1983). *See also Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). All inferences to be drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. den.* 425 U.S.

904, 96 S.Ct. 1495, 47 L.Ed.2d 754. The court's function with respect to the motion for summary judgment is not to try issues of fact but to determine "whether there are issues to be tried." *Schering Corp. v. Home Insurance Company,* 712 F.2d 4, 9 (2d Cir.1983) *quoting Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). See also *Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984); *In the Matter of Iota Industries, Inc., supra.* While there is a need for caution in the grant of a motion for summary judgment when state of mind is an element of the cause of action, the mere presence of such an element, however, is not sufficient in itself to defeat the motion. As stated by the District Court in *Hahn v. Sargent:*

> "[G]reat circumspection is required where summary judgment is sought on an issue involving state of mind ... But that does not mean that a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element."

523 F.2d at 468. *Accord Berard v. General Motors Corp.,* 493 F.Supp. 1035, 1041 (D.C.Mass.1980). In a summary judgment motion the "key is issue-finding, not issue-resolution." *United States v. One Tintoretto Painting,* 691 F.2d at 606.

■■ A fact is material if it tends to resolve any of the issues which have been properly raised or if their existence or nonexistence might affect the result of the action. Conversely, a factual issue that is not necessary to the decision is not material and a motion for summary judgment may be granted without regard to whether

---

General Conditions we signed for you, and if they are missing, in accordance with this form."

"_____     _____"

Name of merchandise     Merchandise owner's
owner                   signature

"_____     _____"

Appraiser's Name        Appraiser's Signature

"_____"

Time of Appraisal

**13.** This court chooses to consider the cross-motion for summary judgment first.

---

Bankruptcy Rule 7056 provides that Rule 56 of the Federal Rules of Civil Procedure applies in adversary proceedings.

Fed.R.Civ.Pro. 56(c) states:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

it is in dispute. Once a fact is determined to be material, the court must determine whether there is a genuine issue regarding it. It has been said that:

> "A material issue is one which affects the outcome of the litigation. To be considered 'genuine' for Rule 56 purposes a material issue must be established by 'sufficient evidence supporting the claimed factual dispute * * * to require a jury or judge to resolve the parties differing versions at trial.'" *Hahn v. Sargent*, 523 F.2d at 464 (citation omitted).

Although the party opposing summary judgment is entitled to all favorable inferences, the party is not entitled to build a case "on the gossamer threads of whimsey, speculation and conjecture." *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir.1962).

### Elements of a Turnover Action Under Code § 542(a)

With these standards in mind, the court may turn to consideration of the case at hand. Counts 1 and 2 of the complaint, the counts seeking turnover of the Diamonds, are predicated on Bankruptcy Code § 542(a). That section provides:

> "* * * [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title * * * shall deliver to the trustee, and account for, such property or the value of such property * * * *"

The first requirement of Code § 542(a) is that the property be property of the estate. Property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. See Code § 541(a)(1).

The other critical element to a debtor-in-possession's entitlement to turnover is the right to use, sell or lease the property under Code § 363. The debtor-in-posses-

sion may use, sell or lease property (other than cash collateral) in which another entity has an interest without consent only if it provides adequate protection. Code §§ 363(e) and 361. The Debtor has made no offer of adequate protection to the Banks and the Banks have not consented to the Debtor's use of the Diamonds.

■ The Debtor's ability to prevail on Counts 1 and 2 of the complaint therefore depends on the Debtor's ability to show that the Diamonds are property of the estate and that the Debtor's rights to the Diamonds are superior to any interests of the Banks. The burden of proof in a turnover proceeding under Code § 542 is at all times on the party seeking turnover. That party must establish a *prima facie* case. See *Gorenz v. State of Illinois Dept. of Agriculture*, 653 F.2d 1179 (7th Cir.1981).

### Count Two—The 32.15 Carat Stone

The Debtor has stated that the Stone, see footnote 4, which is now in UBI's possession is its property. Although UBI disputes this contention, it has conceded it for the purpose of the summary judgment motion only. Therefore, the court presumes the Stone has been sufficiently identified as the Debtor's to permit it to proceed to the second prong the Debtor must prove: that its rights are superior to those of UBI.

■ The substantive issue of the respective rights of the parties in the Stone is governed by Israeli law because the pledge was made in Israel. Inasmuch as this court is not required to take judicial notice of the laws of a foreign jurisdiction, *see Pisacane v. Italia Societa Per Azioni Di Navigazion*, 219 F.Supp. 424 (S.D.N.Y. 1963) and *In re Anselmi*, 52 B.R. 479, 490 (Bankr.D.Wyo.1985), the parties have submitted affidavits on the Israeli pledge law at the court's request.[14]

The affidavits submitted by the parties are from members of the Bar of the State

---

14. The court may apply the law of a foreign jurisdiction where, as here, reasonable notice of intent to apply such law has been given and an opportunity to respond to the issues raised has been had. *See* Fed.R.Civ.Pro. 44.1 made applicable by Bankruptcy Rule 9017 and Advisory Committee Note to Bankruptcy Rule 7001. See,

generally, *Cunard Steamship Company Ltd. v. Salem Reefer Services A.B.*, 773 F.2d 452, 460–61 (2d Cir.1985); *In re Anselmi, supra*, 52 B.R. at 490–91; and Miller, Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine, 1967, 65 Mich.L.Rev. 615.

of Israel. Each agrees on the pertinent statute and that there is a single relevant case.

■ The governing statute is Section 5 of the Israeli Pledges Law 5727–1967. This statute provides:

"Where movable property pledged while in the possession of the pledgor has been deposited as specified in section 4(2) or the pledge thereof has been registered as specified in section 4(3), the pledge shall be effective in all respects even if the pledgor was not the owner of the property or was not entitled to pledge it, provided that the creditor acted in good faith and the property came into the hands of the pledgor with the sanction of the owner thereof or with the sanction of a person entitled to have possession thereof."

Under the terms of the Pledges Law, a valid and effective pledge can be made of property not owned by the pledgor provided that (1) the pledgee acted in good faith and (2) the pledgor came into possession of the property with the sanction of the owner. As to the second issue, it is agreed that the Debtor voluntarily delivered possession of the Stone to Limited. Thus, the property consisting of the Stone came into the possession of the pledgor Limited with the sanction of the owner, the Debtor. Only the first issue is in dispute in this case.

The Debtor's expert, David J. Martin, states in his affidavit that the requirement of good faith under Israeli law is stricter than the comparable U.S. law.[15] He further states that

"e. There is a good argument that the banks were required to investigate the origin of the goods both by contacting a supplier they knew to be sending diamonds on consignment and by examining their own records. At least, they should have explicitly asked the client if the goods were on consignment.

"f. The banks' requirement to investigate is increased by their knowledge of other situations very similar to the one at hand."

Mr. Martin is of the view that a full evidentiary hearing must be held on the good faith issue and that it is highly questionable if the banks acted in good faith and therefore if the pledge is effective.[16]

The Banks' expert, Benjamin Levinbook, after providing an analysis of the concept of good faith in Israeli law, states his opinion as follows:

"9. Under the standards of Israeli law the defendant banks acted in good faith in accepting diamond pledges from Weiss and Wolf, Limited in exchange for credit. This is my opinion even if the defendant banks knew that Weiss and Wolf Limited receive[d] goods on consignment, as long as they did not know that the consigned good had been pledged. The debtor would be required to show that the banks knew that Weiss and Wolf were pledging diamonds which do not belong to them or suspected that such is the case."[17]

---

15. The U.C.C. § 1–201(19) defines good faith as follows:

"Good faith means honesty in fact in the conduct or transaction concerned."

This test is a subjective test. *Bank & Trust Co. of Arlington Heights v. Arnold N. May, Builders, Inc.,* 45 Ill.Dec. 850, 413 N.E.2d 183, 90 Ill. App.3d 454, 30 UCC rep. 552 (1980); *Martin Marietta Corp. v. N.J. Nat. Bank,* 612 F.2d 745, 749 (3d Cir.1979). Merchants are held to a higher standard of good faith than other purchasers. *See* UCC § 2–103(1)(b) which states:

"Good faith in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

16. In its initial affidavit in opposition to the summary motion, the Debtor denied that Section 5 of the Israeli Pledges Law was applicable to the present case. Mr. Martin's affidavit plainly contradicts, and supersedes, this earlier denial.

17. Mr. Levinbrook's affidavit does not consider the question of estoppel, which has been argued by the Banks' New York counsel in the briefs. This question would also be governed by Israeli law but has not been briefed. In light of its holding, the court need not consider the estoppel argument. The court notes that neither Mr. Martin's nor Mr. Levinbrook's affidavit discusses how under Israeli law an entity's implicit or explicit agreement to the pledge of its property

In Mr. Levinbrook's view since, according to Israeli case law, "good faith" is a subjective concept the question is what was the state of mind of the person performing the act and not how that person ought to have acted in the circumstances.

It is ultimately the court's duty to apply the law, even when foreign law, to the facts.[18]  Having set out the experts' view, the court may turn to the only case on point, *M. Dankner & Sons Ltd. v. Fassat & Metarani, et al.*, 30(2) P.D., Supreme Court of Israel Reports 796 (1976).  *M. Dankner & Sons* involved a diamond dealer who delivered some diamonds to a partnership. Pursuant to an agreement, the dealer retained the Israeli equivalent of a security interest in the diamonds and the partnership agreed not to pledge the diamonds prior to paying the dealer.  The agreement further provided that ownership of the diamonds would not pass to the partnership until payment was made.  Prior to paying the dealer, the partnership pledged the diamonds to a bank in contravention of the agreement with the dealer.  Thereafter, the partnership was declared bankrupt. The unpaid dealer brought an action against the bank to recover the diamonds claiming that it still owned the diamonds and that the bank had not acquired a valid pledge.

In holding for the bank, the court found that the bank acted in good faith.  The court stated:

> "The Bank acted in the present case towards the partnership, not only in the manner it acts normally towards its other customers but also in the manner in which other banks act, and such practice cannot be said to be of no significance with respect to the question of good faith.  * * *  In our case, where the Bank acted in the manner in which banks accepting diamonds as security normally act and it so acted towards an old customer whose honesty it had no reason to question, the Bank has discharged all its duties and its act was in good faith.

> \*     \*     \*     \*     \*     \*

> "Even without an express declaration, when the partnership came to the Bank and delivered thereto diamonds as a pledge, this conduct of the partnership ought to be regarded as a declaration that it is entitled to pledge the diamonds. The learned president rightly observed that it is impractical to ask a bank accepting a security from a customer in the ordinary course of business, to make from time to time an inquiry into the customer's right to give the security, in a case where there is no ground to suspect the customer."

The court stated that the notion of good faith as used in the Pledges Law is a subjective concept and that the burden of proof on the good faith issue rested on the pledgee bank.

The facts relative to the pledge of the Stone are as follows: It appears that sometime prior to February 10, 1983, Limited obtained the Stone "on memo" from the Debtor and Moshe Reich on behalf of Limited deposited it in pledge with UBI.  The Stone was then exported to a company in Switzerland.  However, that company chose not to purchase the Stone and it was returned to UBI.  Mr. Oshman, a UBI bank officer states in his affidavit in support of the summary judgment motion that after the Stone was returned from Switzerland to UBI a meeting was held in Israel at which Mr. Wolf personally directed that the returned gem be held by UBI as security for the Limited indebtedness.  Mr. Wolf denies that the Stone was ever discussed at this meeting.  Resolution of this dispute is unnecessary.

for the debt of another would affect the pledge's claim of priority.

18.  See Footnote 14, *supra.*  Although experts' opinions are helpful to a court in gaining an understanding of the foreign legal issues, they do not control the outcome nor do differences

of opinion necessitate the holding of a trial. Here, the foreign law consists of a single, short statute and one relevant case.  This clearly defined inquiry into Israeli law contrasts sharply with the more extensive statutory and case law matters on New York law the parties initially briefed.

Under Israeli law a bank may discharge all its duties and be found to have acted in good faith where it can show it acted in the manner in which banks accepting diamonds as security normally act and it so acted toward a customer whose honesty it had no reason to question. Relations between UBI and Limited had existed for two years prior to the pledge of the Stone. Limited's October 31, 1981 audited financial report shows that Limited owed the Debtor $3,580,002 at that time. On sales of $18,271,999 for the year ended October 31, 1981, Limited's operational profit was stated at $2,684,566, from which was taken finance expenses of $2,757,437, leaving a loss of $96,340 for the period. UBI has stated that Limited transferred $6,866,-947.50 from its account to the Debtor's account during the period March 1980 through January 1981.[19] No evidence has been submitted by the Debtor from which this court can infer that during the period of their relationship circumstances or events occurred that might have caused UBI to doubt Limited's honesty. Nor was there any evidence submitted from which it can be inferred that the transaction respecting the Stone differed in any material respect from prior transactions such that the UBI should have had cause to suspect Limited's honesty.

No evidence has been presented showing that UBI ever had actual knowledge that any diamonds pledged to it by Limited were not, in fact, owned by Limited. Mr. Wolf, whose affidavit was submitted in support of the summary judgment motion, admittedly met personally with UBI to discuss Limited's affairs. At no place in his affidavit does Mr. Wolf state that either he or anyone else on behalf of the Debtor ever advised UBI of any concern or problem or even made any inquiry respecting the pledge to the Bank of any diamonds, including the Stone, consigned by the Debtor to Limited.

The Debtor focuses heavily on an internal UBI memorandum and portions of minutes of a UBI committee meeting held on March 5, 1981, almost one year before the Stone was pledged. These documents establish, the Debtor urges, that UBI knew Limited dealt in consignment stones.

It is common knowledge in the diamond industry that diamond merchants deal in diamonds held on consignment as well as owned. It may be readily inferred therefore that Limited would on at least some occasions deal in diamonds held on consignment. Mendel Kresch, a former employee of the Debtor, testified at his deposition that it is typical in the diamond industry in Israel that diamond merchants operate on a system of trust. He further testified that there is nothing other than trust that prevents a diamond merchant from selling stones received on consignment and retaining the proceeds. Mr. Kresch testified that the standard practice in the industry is to trust the customer and that, unless the diamond merchant entrusts physical possession of the diamonds to its customer, the customer cannot not show them to potential buyers. Kresch stated that it was the Debtor's practice when purchasing diamonds not to require any evidence of ownership:

"Q. How did Weiss-Wolf, Inc., know that the person or entity from whom it was purchasing the diamonds owned the diamonds, or had power to sell them? "A. Trust." Transcript of Deposition of Mendel Kresch taken March 22, 1983 at 108.

The Debtor wants to make UBI its watchdog over Limited and impose a greater burden of inquiry on the Bank than the Debtor conducted in its own transactions. Mr. Wolf has contended that although he is a stockholder in both the Debtor and Limited he "had practically nothing to do with the running of Limited and Weiss had no involvement at all." (Wolf Affidavit ¶ 8). The degree of involvement and control these two men chose to exercise over a corporation they owned and which bore

---

**19.** IDB states that during the period January 21, 1980 to March 5, 1981, Limited transferred $6,252,127 from its account to the Debtor.

their names is irrelevant. The close relationship between the Debtor and Limited did not create a need for heightened scrutiny by UBI. If anything, it created a lessened need because of the significant alternative methods available to the Debtor and Messrs. Weiss and Wolf to monitor and control Limited's operations. Moreover, UBI did take steps in the form of securing guarantees of Limited's debt from the Debtor and from Messrs. Weiss and Wolf which could normally be presumed to cause the guarantors to have an incentive and inclination to supervise actively the affairs of Limited.

General knowledge of an industry-wide system of consignment and trust does not give rise to a conclusion that UBI had sufficient cause to question or suspect that Limited pledged or might pledge diamonds it did not own in violation of its agreements. In *M. Dankner & Sons Ltd.*, the court rejected a similar argument and found that the practice of banks in accepting diamonds pledged by its customers without any inquiry into the customer's right to pledge the diamonds does not constitute bad faith and in and of itself is not evidence of any lack of good faith. The court found that as long as the customer in its past dealings with the bank had given the bank no cause to suspect irregularity in its business or any reason to suspect its honesty the bank's custom and practice was significant in showing the Banks' good faith.

In reaching the conclusions he does on the good faith issue, the Debtor's expert, Mr. Martin is in truth making an argument for the extension of existing law, not an interpretation of it. The other similar situations which Mr. Martin finds to create an increased requirement of investigation are the *M. Dankner & Sons* case itself and similar situations of which he has knowledge through representation of his own clients. Nowhere in the *M. Dankner & Sons*

decision does this court find any suggestion by the court that the bank's practices needed improvement. Likewise, this court does not find in either the Pledges Law or the *M. Dankner & Sons* decision any requirement that a pledgee investigate the ownership of the pledged item with all means at its disposal. Indeed, the court in the *M. Dankner & Sons* states that imposition of such a burden of investigation is commercially impractical. Furthermore, the court found that even without an express representation, the pledgor must be deemed to have declared itself entitled to pledge the property by the very act of pledging it.

■ This court finds that UBI has sustained its burden on the good faith issue and the facts offered by the Debtor relative to good faith, even viewed in the most positive light, are insufficient to warrant a finding that UBI did not act in good faith in accepting the Stone in pledge from Limited. This court concludes therefore that the rights of UBI as a good faith pledgee of the Stone are superior to any ownership interest in the Stone that the Debtor might have. The Debtor is not entitled to turnover of the Stone and grant of the summary judgment motion in favor of UBI respecting the Stone is appropriate.

. Counts One and Two—The Parcels

■ Having disposed of the portion of Count Two relating to the Stone, the court will turn to Count One and the balance of Count Two, which deal with the Parcels, the remaining Diamonds of which the Banks have possession. The first element of the Debtor's turnover action that should be considered is whether the Parcels have been identified as the Debtor's property. The court finds they have not. Having been advised by the court at oral argument that the court found identification lacking, the Debtor filed an affidavit on September 27, 1983 relying on Fed.R.Civ.Pro. 56(f) [20]

---

**20.** Bankruptcy Rule 7056 and Fed.R.Civ.Pro. 56(f) provide a procedure for requesting that the court defer ruling on a motion for summary judgment because the respondent is presently

unable to present facts in opposition. F.R. Civ.P. 56(f) provides:
  "When Affidavits are Unavailable: Should it appear from the affidavits of a party opposing

asserting that the summary judgment motion should be denied until after such time as the Debtor had had discovery of the Banks' records with regard to the identity of the diamonds in their vaults.

The affidavit of Debtor's counsel states:

"4. [T]he books and records of Weiss and Wolf, Ltd., the company which transferred the subject diamonds to defendants, is [sic] in the possession and under the control of the Official Receiver of the State of Israel because Weiss and Wolf, Ltd., is in liquidation in the State of Israel. Accordingly, plaintiff has no access to those books and records.

"5. Furthermore, plaintiff has made numerous requests of defendants for the records of defendants which would indicate the identify of the diamonds held by them.

"6. During the deposition of Anat Ben-David, an employee of Union Bank of Israel, Ltd., testimony was elicited which demonstrated that there was a register in which were recorded all deposits of diamonds into the banks' vaults, and all withdrawals of diamonds from the banks' vaults.

"  *   *   *

"8. To date, these demands have not been met and these documents have not been produced." Affidavit of Theodore T. Mairanz Sworn to September 27, 1983.

This court fails to see how the documents sought to be discovered would help in the identification of the Parcels. At oral argument, the court stated its view that the only dispositive evidence of identity would be that obtained by physical examination of the Parcels. Compare *M. Dankner & Sons* in which a mid-hearing inspection took place. The Banks offered to facilitate an inspection. The Mairanz Affidavit contains no reference to any attempt to arrange a physical inspection nor does it contain any statement of any reason or reasons why an inspection would not be dispositive.

Counsel for the Debtor admitted during oral argument that the reason the Debtor had requested only interlocutory relief was because the Debtor had "problems proving in accordance with the burden that we would have to carry totally that the diamonds were the same ones sent by Inc. [the Debtor] to Limited." Transcript 9/14/83 at 7.[21] The Debtor's Rule 56(f) motion appears to be simply an attempt to avoid an adverse judgment following its admission that it could not identify the diamonds it seeks to have turned over.

Fed.R.Civ.Pro. 56(f) provides that a party opposing a summary judgment motion may obtain a continuance of the motion by presenting to the court affidavits stating why it is unable to present the necessary opposing materials. 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d § 2740 *et seq.* It enables a party "who has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof."

the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other orders as is just."

**21.** This admission is nothing short of astonishing in light of applicable legal standards for securing preliminary relief. The prevailing standard for a preliminary injunction in this Circuit requires the moving party to establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious ground for litigation and a bal-

ance of hardships tipping decidedly in its favor. See, e.g., *Britt, et al. v. U.S. Army Corps of Engineering, et al.,* 769 F.2d 84, 88 (2d Cir.1985). A finding that money damages can remedy any deprivation generally precludes a finding of irreparable injury. See, e.g., *Adamsons v. Wharton, et al.,* 771 F.2d 41, (2d Cir.1985). Bankruptcy Rule 9011, based on Fed.R.Civ.Pro. 11, as amended effective August 1, 1983, provides that the signature of an attorney consists a certificate *inter alia,* that to "the best of his knowledge, information, and belief formed after reasonable inquiry it is *   *   * warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law *   *   *."

*Id.* § 2740 at 530. "The * * * court may also deny summary judgment where the non-moving party 'shows the necessary facts exist but for some good reason he is unable to produce them on the motion.'" *Exxon Corp. v. FTC,* 663 F.2d 120, 126 (D.C.Cir.1980) citing *Donofrio v. Camp,* 470 F.2d 428, 431 (D.C.Cir.1972). The purpose of the rule is to provide an additional safeguard from the drastic impact of a successful summary judgment motion. However, mere making of a motion under the rule will not forestall summary judgment in an appropriate case. *U.S. v. Manufacturers Bank of Southfield,* 518 F.Supp. 495 (E.D.Mich.1981).

> "A 'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f). Rule 56(f) cannot be relied upon to defeat a summary judgment motion 'where the result of a continuance to obtain further information would be wholly speculative'."

*Contemporary Mission, Inc. v. U.S. Postal Service,* 648 F.2d 97, 107 (2d Cir.1981).

UBI has stated that the descriptions in the registers the Debtor seeks are no more definite than those already given. Anat Ben-David testified at his deposition, referred to in the Mairanz Affidavit, that the deposit register contains information as to when and by whom deposits were made. The register of withdrawals contains only the name of the client. The Debtor has failed to state how those registers would assist it in identifying the diamonds in the Parcels. Moreover, the Banks have shown without contradiction that the Debtor is not the sole source from which Limited obtained diamonds. That further document discovery could be conducted is not in dispute. However, the court does not agree that the document discovery sought would tend to establish material issues of fact relative to the Parcels.

Any doubt on the subject of identification was laid to rest by the affidavits of Debtor's counsel[22] and Mr. Wolf submitted in opposition to the summary judgment motion.

Mr. Wolf's affidavit states:

> "5. Ltd. obtained substantial quantities of diamonds from Inc. Most of those diamonds had been originally delivered to Ltd. on consignment, and upon resale to other dealers, Ltd. purchased them from Inc. and payment was made for these diamonds. All of these diamonds were resold by Ltd. during 1980 and the first half of 1981. *As of January, 1982, the first date that Union Bank of Israel Ltd. ("UBI") or Israel Discount Bank, Ltd. ("IDB") admits receiving the diamond[s] they now hold, the gems sold by Inc. to Ltd. were not in the possession of Ltd. anymore.*" Affidavit of Isaac Wolf Sworn to September 3, 1983. (Emphasis added).

To similar effect is the affidavit of Debtor's counsel:

> "Something slightly closer to the issues before this Court is approached when Mr. Darwish presents a list of the diamonds delivered by Limited to IDB. These diamonds were, however, delivered between *January 29, 1982 and April 1, 1982. To contend that these were the same diamonds that were purchased by Limited from [the Debtor] between ten*

---

**22.** The form of affidavits which may be submitted are described in Fed.R.Civ.Pro. 56(e) as:

> "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The Mairanz Affidavit fails the 56(e) test as Mr. Mairanz is not a competent witness to the facts stated in his affidavit, both because he is the party's attorney and because he lacks personal knowledge of the facts. See Rule 602 of the Federal Rules of Evidence ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."); and DR 5–102 of the Code of Professional Responsibility (A lawyer should withdraw from the conduct of a trial if it is evident that he or a lawyer in his office should be called as a witness.).

*months and two years prior thereto flies in the face of logic and the reality of the diamond business and is mere speculation. . Clearly, the diamonds which were purchased by Limited up to two years prior, had more than likely already been sold in the interim."* (Emphasis in original in part and added in part.) Affidavit of Moshe Z. Mirsky Sworn to September 7, 1983 at ¶ 56.

As these affidavits admit, if the diamonds were sold by Limited in the interim, it is logically impossible for the Parcels to contain those diamonds.

The Debtor's request for turnover of the Parcels contained in counts One and Two and in the motion for preliminary relief fails first because of lack of proof of identity of the Parcels as containing any diamonds belonging to the Debtor.

Equally significantly, however, the Debtor's request must fail because the proof on the good faith issue is identical to that already discussed in connection with the Stone. Again the result is that the Banks' rights are superior to any rights of the Debtor in the Parcels. The Banks' summary judgment motion as to Count One and the balance of Count Two is therefore granted.

### Counts Three, Four and Five—Conversion and Conspiracy

Counts Three and Four assert that the Banks converted property of the Debtor. In order to establish a cause of action for conversion, a plaintiff must show:

(1) Legal ownership or an immediate superior right of possession, and

(2) Exercise by defendant of unauthorized dominion over the amount in

question, to the exclusion of the plaintiff's rights.

*First National Bank of Highland v. Merchant's National Insurance Co.,* 392 N.Y. S.2d 836, 838, 89 Misc.2d 771 (1977), *affirmed,* 410 N.Y.S.2d 679, 65 A.D.2d 59 (1978). See also 18 Am.Jur.2d, Conversion, § 1 ("A conversion takes place where a person does such acts in reference to the personal property of another as amount, in view of the law, to the appropriation of the property to himself. * * * [A] conversion imparts an unlawful act, or an act which cannot be justified or excused in law." At 158–9).[23]

The elements of proof that the Debtor show to prove its conversion causes of action reduce to the same ones the Debtor was required to show for a successful turnover action. First, the Debtor must show that it owned or had a superior right of possession to the property alleged to have been converted by the Banks. Second, the Debtor must show that the Banks' exercise of dominion was unauthorized and not justified or excused in law. Once again, the Israeli Pledges Law with its good faith question is paramount.

On ownership, the Debtor has submitted thirteen bills of sale purporting to show sales of diamonds from the Debtor to Limited from the period of March 20, 1980 through October 30, 1980. However, these bills of sale in and of themselves establish nothing. There is no demonstration of any correlation between these bills of sales and any pledges made by Limited to the Banks. If, as it appears, the bills of sale reflect sale of diamonds to Limited, then the Debtor had parted with its ownership interest in the diamonds and cannot complaint of their subsequent pledge by Limited to the Banks. If, on the other hand, these bills of

---

**23.** Strictly speaking, the cause of action for conversion would also be governed by Israeli law, which has not been briefed. The general principles of such a cause of action are, however, of a universal nature. In the absence of being directed to controlling principles of Israeli law, the court may choose, as it does here, to apply the laws of the State of New York regarding the causes of action for conversion. *See Commer-* *cial Insurance Company of Newark, New Jersey v. Pacific-Peru Construction Corp.,* 558 F.2d 948, 952 (9th Cir.1977); *Bowman v. Grolsche Bierbrouwerij B.V.,* 474 F.Supp. 725, 730 (D.Conn. 1979). As discussed, *infra,* the court has applied Israeli law to the substantive issue of whether the Banks acted wrongfully as to property of the Debtor.

sale evidence only consignment transactions as the Debtor contends, then the Debtor's rights are governed by the Israeli Pledges Law.

The Debtor has, as indicated earlier, submitted a Rule 56(f) affidavit seeking denial of the summary judgment motion to permit further document discovery. As to Counts Three and Four, the requested document discovery could have some tendency to assist the Debtor in meeting its burden of proof. The diamonds cannot be inspected as the Banks no longer have them since they were sold by Limited.[24] Were this the only issue, denial of the summary judgment motion might be appropriate.

It is not the only issue, however. The good faith of the Banks is again in issue since the Banks can defeat the Debtor's conversion claim, assuming the Debtor was the owner of the pledged diamonds, under the Pledges Law if the Banks acted in good faith in accepting the pledges. The court has previously found that the Banks have demonstrated their good faith position as pledgees. The Debtor has no more specific evidence of any lack of good faith on the part of the Banks relative to these earlier pledges that it offered with respect to the Stone and the Parcels. The Debtor's evidentiary offer in opposition to the summary judgment motion as to Counts Three and Four is insufficient to raise a triable issue of fact. Count Five, the conspiracy count, falls when Counts Three and Four fall. Summary judgment in favor of the Banks on Counts Three, Four and Five is therefore appropriate.

## CONCLUSION

The Banks' cross-motion for summary judgment dismissing the complaint is granted. The Debtor's motion for preliminary relief is denied as moot.

Prevailing party to settle appropriate judgment.

---

**24.** How the Banks could have converted property of the Debtor which was in fact sold by

Limited is a question which need not be reached.