**In re C & C TV & APPLIANCE, INC., Debtor.**

**Bankruptcy No. 88–14430S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 16, 1989.

As Amended March 27, 1989.

---

Alan R. Gordon, Robert S. Blau, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Landlord.

Lawrence J. Lichtenstein, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for Transamerica.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

Rosetta B. Packer, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., for Fidelity Nat. Bank Ass'n.

Gary M. Schildhorn, Adelman, Lavine, Gold & Levin, Philadelphia, Pa., for debtor.

James W. Adelman, Morris & Adelman, Philadelphia, Pa., for Caloric Corp., Whirlpool Acceptance Pierce Phelps Corp.

Marvin Krasny, Wolf, Block Schorr & Solis–Cohen, Philadelphia, Pa., for Creditors' Committee.

David C. Schattenstein, Perkin, Rapport, Schattenstein & Feldman, Allentown, Pa., for ITT Commercial Financial Corp.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant dispute between the Debtor and its landlord pursuant to a lease containing a purchase option, tests the power of the landlord to unilaterally terminate the parties' contract on the basis of a forfeiture clause. Since we believe that such a clause must be construed narrowly, we hold that, in several respects, the landlord has failed to establish that it met the prerequisites for termination of the lease under its own terms. We also hold that the landlord's attempt to utilize extrajudicial means to terminate the lease would not be permissible in any event.

The Debtor, a retailer of household appliances, filed this Chapter 11 case on December 22, 1988. A motion to utilize cash which was collateral for debts owed to the floor planners or financiers of the Debtor's merchandise was bitterly fought from the outset, because the financiers were painfully aware that the Debtor had sold approximately $1.5 million of merchandise "out of trust," *i.e.*, it had made retail sales without remitting the wholesale purchase prices to the financiers pursuant to the terms of their security agreements. The largest of the financiers, Transamerica Commercial Finance Corporation (hereinafter referred to as "Transamerica"), whose sales "out of trust" exceeded $1 million, nevertheless agreed to enter into an agreement to continue financing the Debtor, as long as certain payments and assurances were made to it. One of the most important of these assurances was that it would receive a priority in the proceeds which the Debtor hoped to realize from a sale and leaseback of a portion of its valuable, but oversized business headquarters, of which it retained possession under a lease with an option to purchase. The other, under-secured financiers objected to certain aspects of the agreement between the Debtor and Transamerica, as unfairly preferential to the latter.

On January 3, 1989, we conducted a lengthy hearing on the issues of whether the Debtor's agreement with Transamerica should be approved and whether the Debtor could use the cash collateral of Transamerica and/or the other financiers on any basis if approval of the agreement with Transamerica were disapproved. At its close, we allowed the Debtor to proceed under the terms of the proposed agreement until January 17, 1989, when a hearing on whether to continue our approval of the agreement through its projected date of termination, March 29, 1989, would be conducted.

The owner of the real estate housing the Debtor's headquarters at 191 South Gulph Road, King of Prussia, Pennsylvania (here-

inafter "the Premises"), Emory Hill McConnell & Associates (hereinafter "the Landlord"), was present at the January 3, 1989, hearing. In the course of this hearing, it became apparent that the most substantial asset of the Debtor was an option to purchase the Premises for between $2.34 and $2.43 million, depending on the date of exercise of an option to purchase, that was contained in a Lease Agreement of November 14, 1986. The Debtor was compelled to utilize this asset as a bargaining chip in which it would provide the creditors an interest as security in its efforts to convince them that it could adequately protect their rights in its future operations. The Landlord's counsel, who was present, advised all of the parties present that it believed that it had terminated the Debtor's interest in the lease and option prior to the bankruptcy filing. However, upon ascertaining that the Landlord's contention was based merely upon dispatch of a pre-petition termination notice, as opposed to a duly-executed pre-petition writ of possession for the Premises, we expressly stated that we doubted that the Landlord's position had merit. Transamerica and the other financiers, as will be noted, obviously agreed with and relied upon this assessment of the Landlord's rights.

On January 17, 1989, we sustained the financiers' Objections to the Debtor's agreement with Transamerica and scheduled a hearing on the Debtor's motion to use cash collateral on January 19, 1989. At the outset of the hearing on January 19, 1989, we were advised that the Debtor, Transamerica, and the other financiers were close to a settlement, which was in fact effected by a Stipulation presented to us on January 20, 1989. The Stipulation included sharing by the other financiers in the priority in the proceeds of the Debtor's proposed sale of its interest in the Premises. The Landlord objected to this Stipulation on the ground that the Debtor no longer had an interest in the Premises to sell, but we approved the Stipulation in an Order of January 23, 1989. No appeal from this Order was filed.

In the meantime, on January 11, 1989, the Landlord filed one of the matters pres-

ently before us, a Motion to obtain a declaration from this court that it had effectively terminated the Debtor's lease pre-petition and/or to obtain relief from the automatic stay to evict the Debtor from the Premises. The Debtor, Transamerica, and the Creditors' Committee appointed in the Debtor's case all answered and opposed the Landlord's motion. The Debtor included, as an alternative defense in its answer, a "counter-motion" to avoid any termination of the lease by the Landlord under 11 U.S. C. § 548(a)(2). Prior to the hearing on the Landlord's motion, continued by agreement until February 14, 1989, the Debtor filed the second of the matters presently before us, a motion to assume the executory Lease Agreement concerning the Premises and a lease at its other business location in East Lansdowne, Pennsylvania.

On February 14, 1989, the parties agreed to submit the Landlord's motion on a Stipulation of Facts, believed to be forthcoming on February 17, 1989. When no final Stipulation could be effected, the parties agreed to continue the hearing to the date of the scheduled hearing on the Debtor's motion, March 8, 1989. We directed the parties to file any Briefs supplemental to those already filed with the motions and answers and to prepare a Stipulation of Facts to the extent that they could prior to that hearing.

A rather comprehensive Stipulation of Facts was presented at the hearing on March 8, 1989. The only additional testimony of any substance was presented by David J. Ross of Ross Investment Group, who stated that he and the Debtor had executed a "letter of intent" by which he would purchase the Debtor's interest in the Premises for $2.69 million. This agreement was said to result in a $350,000.00 gross profit to the Debtor, and to include the desideratum of a leaseback of a portion of the Premises to the Debtor.

We believe that the entire controversy manifests a problem of ascertaining the legal effect of certain paragraphs of the Lease Agreement in light of the course of conduct of the parties. Most significant is the following portion of paragraph 19 of

the Lease Agreement, which the parties stipulate was the subject of negotiation and draftsmanship by counsel representing both parties:

19. DEFAULT PROVISIONS:

In the event of any default of Tenant in paying any installment of Basic Rental, additional rent or other sums payable hereunder, Landlord may elect to immediately terminate this Lease by serving a written notice upon Tenant not less than five (5) days after the day of serving such notice; provided that this Lease shall not terminate or expire if Tenant remedies such nonpayment within such five (5) day period. Landlord shall not be required to give Tenant notice of any default in the payment of rent more than two (2) times in any twelve month period....

Also of significance is the following portion of paragraph 32 of the Lease Agreement, which describe how notices are to be provided under the Lease:

32. NOTICES:

All notices to Tenant under this lease shall be conclusively presumed to have been delivered, one day after mailing by United States mail, first class, certified or registered, and postage prepaid, addressed to Tenant, C & C TV and Appliance, Inc. at 101 East Baltimore Pike, East Lansdowne, PA 19050 or to such other address as Tenant may in writing from time to time designate, with a copy to Stephen M. Foxman, Esquire, Hangley Connolly Epstein Chicco Foxman & Ewing, 1429 Walnut Street, 14th Floor, Philadelphia, PA 19102....

Prior to December, 1988, the Landlord sent letters complaining that late rental payments had been made addressed to the Debtor's principal, Harvey Connors, at the Premises only, on the following dates: July 19, 1988; September 29, 1988; November 14, 1988; and November 17, 1988. All but the November 14, 1988, letter were sent by certified mail. However, of these, only the letter of September 29, 1988, had been forwarded to Mr. Foxman and this letter specifically stated that the Landlord "does not desire to terminate your tenancy," but would "take all actions authorized by the Lease and under the law" if the September rent were not paid by October 4, 1988. The September rent was paid on September 29, 1988. The letter of November 17, 1988, stated, apparently referring to paragraph 19, that "[t]he lease authorizes the Landlord to terminate the lease if rent is not received within five (5) days of the due date." The November rent was not paid until November 28, 1988.

On December 6, 1988, the Landlord dispatched a regular-mail letter to Mr. Connors at the Premises, not copied to Mr. Foxman, which is almost identical to the letter of November 17, 1988, except that it refers to the December rent. On December 13, 1988, a certified-mail letter was sent to Mr. Connors at the Premises, again not copied to Mr. Foxman, stating that it was "formal notice" of the Landlord's "serious concern" about the Debtor's rent payment pattern. It further states that the Landlord is "pursuing legal channels which would make the lease existing null and void and the option conditions no longer pertinent" and asks the Debtor to review its demand that rent be paid by the first of each succeeding month prior to an apparently pre-arranged meeting of December 21, 1988.

At the meeting of December 21, 1988, the Debtor divulged that it was considering an imminent bankruptcy filing. Later that day, the Landlord sent a letter to the Debtor stating, *inter alia*, that the Lease Agreement "has been terminated, effective 5:00 P.M. this date;" that the failure to pay the December rent of $23,598.00 and a $137.90 sewer charge "constitutes an event of default;" and that "[s]ince [the Debtor] has already received two notices of events of default during the 12–month period, no notice of default is required under the Lease." This notice, which the Landlord claims was effective, in itself, to terminate the lease, was sent by certified mail to the East Lansdowne address (the only one of all of the notices sent there) and Mr. Foxman, hand-delivered or telecopied to the Debtor's counsel in this bankruptcy. Although addressed to Mr. Connors, it was

also hand-delivered to one Bill Hackenback, an employee at the Premises, at 8:45 P.M., 15 minutes prior to close of business.

The starting point of our analysis is the body of law, cited by us in *In re Sudler,* 71 B.R. 780, 785 (Bankr.E.D.Pa.1987),

> which has termed forfeitures as "odious," *Arcon Development Corp. v. United States,* 409 F.Supp. 671, 673 (W.D.Pa. 1976); "disfavored," *Barraclough v. Atlantic Refining Co.,* 230 Pa.Super. 276, 281, 326 A.2d 477, 479 (1974); and "abhorrent," *In re Kam Dam Marina, Inc.,* 20 B.R. 414, 416 (Bankr.W.D.Pa. 1982); and *Jackson v. Richards 5 & 10, Inc.,* 289 Pa.Super. 445, 452, 433 A.2d 888, 892 (1981).

In light of this disfavor of forfeitures under the controlling Pennsylvania law, the Landlord was obliged, at the very least, to establish that it had effected performance in strict conformity with the prerequisites for same set forth in the lease in order to effect a valid forfeiture of the Lease Agreement. Reading paragraphs 19 and 32 of the Lease together, we find that the Landlord was required to provide the Debtor with a five-day "cure period" unless it had provided at least two "notices of default" to the Debtor in the prior 12–month period. Moreover, *all* notices, obviously including "notices of default," were required to be copied to, *inter alia,* Mr. Foxman and are "conclusively presumed" to be delivered one day after a mailing to the Debtor's East Lansdowne, Pennsylvania address (there was no evidence that the Premises had been "designated" by the Debtor as a place of notice) and to Mr. Foxman.

The Landlord only copied one "notice of default" to Mr. Foxman prior to the December 21, 1988, letter. Therefore, it had *not* dispatched two "notices of default" in conformity with paragraph 32 of the Lease prior to December 21, 1988. Hence, it was obliged to provide the five-day cure period in the letter of December 21, 1988. Having failed to do so, the December 21, 1988, letter could not serve its expressed purpose of immediately terminating the Lease.

Furthermore, the letter of December 21, 1988, was "conclusively presumed," *i.e., must* be so deemed, to be delivered one day after its dispatch to the Debtor at its East Lansdowne address and to Mr. Foxman. Thus, it was not deemed delivered until the time of the mail delivery to all of these parties on December 22, 1988. The delivery to Mr. Hackenback was gratuitous and clearly was not a permissible "substitute" for delivery of the notice to the Debtor at its "official" address per paragraph 32 of the Lease, which, notably, also required service on the Debtor's counsel. The Debtor filed the instant bankruptcy case prior to 9:00 A.M. on December 22, 1988. It is most likely that this filing preceded mail delivery of the notice at the East Lansdowne address and to Mr. Foxman. Therefore, it is apparent that the notice was "delivered" subsequent to the effectuation of the automatic stay upon the bankruptcy filing and is therefore void. *See, e.g., In re Clark,* 69 B.R. 885, 889–90, *modified,* 71 B.R. 747 (Bankr.E.D.Pa.1987).

There are, therefore, at least two separate bases on which we would be compelled to rule against the Landlord on the issue of whether it had validly terminated the Lease, even if we gave it the benefit of every doubt in interpretation of paragraph 19 and even if we accepted its contention that it could unilaterally terminate the Debtor's Lease without any invocation of court processes.

We would, however, point out that it is not at all clear that paragraph 19 contemplated that the five-day period between the notice of termination and termination of the Lease itself would ever be wiped out, even if there *had* been two properly-noticed "notices of default" in the prior 12–month period. Rather, it appears to us that it was only the five-day *cure* period which could be eliminated by the dispatch of two prior "notices of default" in the previous year. Thus, as we read paragraph 19, keeping in mind the principles of controlling state law which disfavor forfeitures, it would always give the Debtor at least five days time to organize its affairs *or* seek court intervention to prevent an unjustified attempt to

terminate the Lease after receipt of a notice of termination.

The need for an opportunity for court intervention in the process of lease-termination is highlighted by the fact that, here, the Landlord *was*, as we have found, proceeding precipitously in declaring a forfeiture of the Lease. The need for a mechanism to check an improper attempt by the Landlord to effect a forfeiture in turn reveals what we believe is a basic flaw overlaying the Landlord's efforts to terminate the Lease in issue. We question whether a landlord can ever declare a forfeiture and obtain a non-consensual right to possession of realty without obtaining a judgment for possession in the Pennsylvania courts which is no longer subject to a statutory right to cure.

The assumption that a court-judgment granting possession to the landlord is a necessary condition for termination of a lease is implicit in this court's decisions in *In re Telephonics, Inc.*, 85 B.R. 312, 316 (Bankr.E.D.Pa.1988); *Sudler, supra*, 71 B.R. at 785–86; and *In re DeSantis*, 66 B.R. 998, 1002–03 (Bankr.E.D.Pa.1986) (FOX, J.). In those cases, it was further held by this court that not only the applicable rules of court in Pennsylvania District Justice of the Peace courts, but also the common law of Pennsylvania, allows a tenant to redeem a lease terminated for non-

payment of rent at any time before completion of execution on the writ of possession, resulting in final and proper actual dispossession of the tenant. *Compare Sudler, supra*, 71 B.R. 787 (failure of magistrate to effect "actual delivery" of a premises to the landlord renders an attempted eviction incomplete). We underscore that this is a part of the common law of Pennsylvania, because it is set forth in 68 P.S. § 250.504, a provision of the Landlord and Tenant Act of 1951 repealed but not replaced by any provision in the Pennsylvania Judiciary Act Repealer Act. 42 Pa.C.S. § 20003(b). *See Sudler, supra*, 71 B.R. at 785–86; *DeSantis, supra*, 66 B.R. at 1002 n. 11.

Therefore, we reject the Landlord's suggestion that the tenant's right to redeem could be circumvented by the Landlord's observation that it could resort to the common pleas courts instead of the district justice courts of Pennsylvania to enforce its rights. The right of a tenant to redeem a lease terminated for non-payment of rent is a part of Pennsylvania common law enforceable in all of its courts.[1] It would, of course, make no logical sense to condition the existence of the tenant's right to redeem a lease on the forum which the landlord unilaterally chose. None of the cases cited by the Landlord hold that the statutory right to redeem can be compromised in any Pennsylvania court.[2]

---

**1.** We recognize that 68 P.S. § 250.504 makes reference to an action before a "justice of the peace." However, in the last paragraph, specifically addressing the right to redeem, the statute provided that redemption could be effected by "paying to the constable *or sheriff*" (emphasis added) the rent in arrears. A sheriff is the judicial officer who executes upon judgments in common pleas courts. We note that, in *DeSantis, supra*, Judge Fox expressed no hesitancy in applying the procedures set forth in this former statutory provision to the case before him despite the fact that it arose in Philadelphia, where the jurisdiction exercised by a "justice of the peace" elsewhere in the state is conferred in the Philadelphia Municipal Court.

**2.** The cases relied upon by the Landlord are inapposite for the following reasons: *In re Triangle Laboratories*, 663 F.2d 463 (3d Cir.1981) (construing New Jersey law; case merely remanded for a determination of whether termination had occurred); *202 Marketplace v. Evans Products Co.*, 593 F.Supp. 1133, 1135–36 (E.D.Pa.

1984) (court merely states conditions under which a "forfeiture clause" of a lease will be upheld, and such a clause was not upheld there due to the landlord's failure to meet his "heavy burden"); *Elizabethtown Lodge No. 596, Loyal Order of Moose v. Ellis*, 391 Pa. 19, 137 A.2d 286 (1958) (court holds that demand for rent is necessary and strikes off confessed judgment for possession because of the landlord's failure to prove the requisite demand); *Blue Ridge Metal Mfg. Co. v. Proctor*, 327 Pa. 424, 194 A. 559 (1937) (case proceeded enactment of Landlord & Tenant Act; forfeiture allowed where tenant acted totally inconsistently with good faith and fair dealing); and *Nahas v. Nahas*, 175 Pa.Super. 188, 103 A.2d 473 (1954) (forfeiture allowed because of late rental payment, although an order staying execution of a judgment for possession was also affirmed).

The issue of the tenant's right to redeem was not raised or discussed in any of these cases. We also note that none of these cases support the principle that the landlord can unilaterally terminate a lease without a court proceeding to

Here, the Landlord contends that its unilateral act of declaring the lease terminated effected a forfeiture. If this principle were true, the right of a tenant to *redeem* after an act of default would be of no practical value. Redemption is permissible, under 68 P.S. § 250.504, until a writ of possession is actually executed. Moreover, the pervasive presence of the right to redeem embodies an implicit presumption that a court judgment for possession must initially be entered in favor of the landlord, which supports a writ of execution, before the right of redemption can be extinguished. The law of Pennsylvania does not sanction unilateral declarations of forfeitures, such as self-help evictions. *See, e.g., In re Adams*, 65 B.R. 646, 649–50 (Bankr.E.D.Pa.1986); and *Lenair v. Campbell*, 31 Pa.D. & C.3d 237 (Phila.Co.C.P.1984). We therefore conclude that a state-court determination that a lease has in fact been terminated or some other unequivocal act by the tenant confirming the fact that a prior tenancy has ended must occur pre-petition before it can be said that a termination of a debtor's lease precedes bankruptcy. *Cf. In re Adams, Adams v. Philadelphia Housing Authority*, and *In re Bowens, Bowens v. Philadelphia Housing*, 94 B.R. 838, 847 n. 4 (Bankr.E.D.Pa.1989) (an alleged abandonment of a leasehold is valid only if the abandonment is in fact clearly established). As we stated at *id.*, at 852 n. 7, we cannot subscribe to the apparent holding in *In re McGovern Auto Specialty, Inc.*, 40 B.R. 521, 522–23 (Bankr.E.D.Pa.1984), that the mere pre-petition dispatch of a notice of termination of a lease is sufficient to effect a pre-petition termination of a debtor's lease.[3]

■ In our view, procedural due process of law requires that, where the debtor-tenant contends that the lease under which it holds possession has not been terminated, a final court determination that a pre-petition lease termination has been effected must be made before a valid forfeiture can occur. We note that a court judgment for possession was entered against the debtor-tenants pre-petition in *Telephonics, Sudler,* and *DeSantis.* Nevertheless, due to the vitality of the tenant's right to redeem, no effective pre-petition lease termination was found in any of those cases.

It might be contended that the Debtor waived his right to procedural due process by executing a lease containing a clause such as paragraph 19. However, it must be recalled that any waiver of procedural due process, especially one such as this in the nature of a confession of judgment, must be knowing, voluntary, and intelligent. *See, e.g., In re Bell, Bell v. Philadelphia Housing Authority*, 97 B.R. 208, 217 (Bankr.E.D.Pa.1989); *In re Burch*, 88 B.R. 686, 693 (Bankr.E.D.Pa.1988); and *In re Souders*, 75 B.R. 427, 435–37 (Bankr.E.D.Pa.1987). There is no evidence that the Debtor or Mr. Foxman, his counsel at the time of execution of the lease, meant to allow the Landlord to unilaterally terminate the Lease without the Debtor's having any chance to contest the legal propriety of the Landlord's action in a court of law. It is more likely that the Debtor meant to only give the Landlord a right to allege in court that a certain course of action constituted a termination of the tenancy. In such a scenario, the Debtor would, of course, have a full opportunity to defend. There is also a question as to whether a waiver of such essential rights could ever be enforceable. *See Bell, supra,* at 217; *Souders, supra,* 427 B.R. at 435–37. Therefore, we do not believe that the Landlord's mere unilateral claim of a pre-petition lease termination, unsupported by a court-judgment, would, in any event, be a basis for us to bar the Debtor from assuming the lease.[4]

---

determine the validity of the attempted forfeiture.

**3.** We also note that the correspondence of the Landlord to the Debtor implicitly assume that a court proceeding must ensue before the lease can be terminated. The letter of September 29, 1988, implies that "actions authorized . . . under the law" are needed before a termination can be effected. Similarly, the letter of December 13, 1988, makes reference to the "legal channels" which must be pursued before the lease and the option become null and void.

**4.** There would also appear to be merit in an argument raised by Transamerica that, not having appealed the Order of January 23, 1989,

The Landlord articulated no other objections to the Debtor's attempt to assume the Lease and sell his interests to Ross Investment Group nor grounds for relief from the stay other than its contention that the Lease Agreement had been terminated, and we can detect none. We note that the Debtor has paid all of the post-petition rent (assuming its check for the March, 1989, rent, tendered just before the March 8, 1989, hearing, clears) and that its only delinquency is the December rent plus the nominal sewer charge. *Compare In re Gold Standard at Penn, Inc.,* 75 B.R. 669, 671–72 (Bankr.E.D.Pa.1987) (debtor-tenant delinquent almost one year in rent was permitted to assume lease). There is little doubt that the proposed buyer is financially secure; that the assignment to it cannot be barred, *see* 11 U.S.C. § 365(f); and that the proposed buyer's healthy financial status is adequate assurance that the party will effect the sale and pay off any indebtedness owed to the Landlord. *See* 11 U.S.C. § 365(b). *Compare Gold Standard, supra,* 75 B.R. at 673–76 (debtor-tenant permitted to liquidate rent delinquency over a time-frame in excess of five years).

We shall therefore enter an Order denying the Landlord's motion and granting the Debtor's motion to assume the Lease of the Premises in issue.[5]

approving the Debtor's stipulated agreement with Transamerica, the Landlord should be estopped from contending that the lease was terminated and that the Debtor may not assume it, as the Debtor's right to so do is the centerpiece of the stipulation. Obviously, a ruling in favor of the Landlord would overturn the reasonable expectations of all of the financiers.

Also of possible substantive merit is the Debtor's argument that even a totally-effective lease termination would be avoidable under 11 U.S.C. § 548(a)(2). *See In re Pinto,* 89 B.R. 486, 494–98 (Bankr.E.D.Pa.1988). However, we also agree with the Landlord's assertion that the Debtor's attempt to raise this issue in the form of a "counter-motion" or "cross-motion" to the Landlord's motion was procedurally defective. *See In re Summit Airlines, Inc.,* 94 B.R. 367, 369. (Bankr.E.D.Pa.1988). The fraudulent conveyance argument, apparently rendered moot by our disposition here, would have had to have been raised in a separate adversary proceeding. *See* Bankruptcy Rule 7001(2). Of course, this could have been done, and probably could have been done successfully.

5. That aspect of the Debtor's motion seeking to assume the East Lansdowne Lease has been continued to March 29, 1989.