In re John F. PANAS, Debtor.

John F. PANAS, Plaintiff,

v.

POLONIA SAVINGS & LOAN ASSOCIA-TION and Zdzislaw Roguski and John Doe and Jane Roe, Defendants.

Bankruptcy No. 88–14407S.
Adv. No. 89–0179S.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 7, 1989.

Irwin Trauss, Community Legal Services, Inc., Philadelphia, Pa., for debtor.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Leon A. Mankowski, Philadelphia, Pa., for Polonia Sav. & Loan Ass'n.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant proceeding causes us to address the rights of a mortgagee in possession of certain residential realty, and the ability of a debtor-mortgagor to regain possession of that realty by means of a turnover proceeding under 11 U.S.C. § 542(a). We conclude that the Mortgagee here, although otherwise obliged to comply with a Pennsylvania statute requiring notice prior to taking possession of the realty, was excused from same due to the abandonment of the property by the Debtor and his ex-wife-co-mortgagor. Hence, we conclude that the Mortgagee acted within its rights in taking possession of the realty.

However, we further hold that applicable bankruptcy law allows the Debtor to regain possession of the realty prior to the occur-

rence of the usual pre-condition for recovering possession, *i.e.*, payment of the mortgage balance in full, if the Debtor provides adequate protection to the Mortgagee's interest in the realty. We also conclude that the conditions which we impose upon the Debtor, notably prompt payment of the mortgage balance in full with interest, will provide such adequate protection. Therefore, we hold that, under the conditions set forth in our accompanying Order, the Debtor is entitled to possession of the realty in issue, 2901 Memphis Street, Philadelphia, Pennsylvania (hereinafter "Memphis St.") vis-a-vis the Mortgagee. This resolution does not affect the rights of the other defendants named in this proceeding, and the Debtor will be obliged to litigate his rights against these parties, including the present residents of Memphis St., at another time and hopefully another place.

## B. PROCEDURAL HISTORY

The Debtor, JOHN F. PANAS (hereinafter "the Debtor"), filed the instant underlying Chapter 13 bankruptcy case on December 19, 1988. This case had been preceded by two prior bankruptcies of the Debtor in which he was represented by his present counsel. The first case, Bankr. No. 82–03779K, was filed on August 10, 1982, and was dismissed on the motion of the Standing Chapter 13 Trustee on September 6, 1984.

The second case, Bankr. No. 85–03208G, filed on August 2, 1985, was more memorable. It featured several pieces of litigation between the Debtor and the mortgagee of a premises in which he was then and is presently still residing at 2957 Aramingo Avenue, Philadelphia, Pennsylvania 19134 (hereinafter "Aramingo Ave."), Carondolet Savings and Loan Association (hereinafter "Carondolet"). *See* 68 B.R. 421 (Bankr.E.D.Pa.1986) (court refuses bisect Carondolet's claim in light of the interest of the Debtor's spouse in Aramingo Ave., since that property was then owned by the entireties); 63 B.R. 637 (Bankr.E.D.Pa.1986) (court grants Carondolet relief from the automatic stay in light of the debtor's 43–month payment delinquency); and Adv. No. 87–0049S (Bankr.E.D.Pa. Jan. 30, 1987) (court refuses to reinstate the stay pending appeal of above orders). Ultimately, Carondolet attained a state-court judgment in foreclosure against the Debtor and filed a further suit to obtain possession of Aramingo Ave. from the debtor. That bankruptcy case was dismissed on October 13, 1988, and closed on December 19, 1988.

The present bankruptcy case was initiated on the date of the closing of the prior case, apparently timed to stay Carondolet's state-court proceeding to eject the Debtor from Aramingo Ave. On February 8, 1989, Carondolet moved for relief from the automatic stay in this case and we granted it such relief in an Order of April 13, 1989. In addition to appealing that Order to the district court, the Debtor removed the state-court ejectment proceeding to this court, at Adv. No. 89–0433S, on May 15, 1989. That matter is listed for trial on June 20, 1989.

The instant adversary proceeding was commenced on March 10, 1989.[1] Named as defendants were POLONIA FEDERAL SAVINGS & LOAN ASSOCIATION (herein "the Mortgagee"), ZDZISLAW ROGUSKI (hereinafter "Roguski"), an individual whom the Mortgagee authorized to rehabilitate and inhabit Memphis St., and JOHN DOE and JANE ROE, pseudonyms of the present residents of Memphis St. (hereinafter "the Residents"), apparently under a lease arrangement with Roguski. Only the Mortgagee answered. The matter came to trial on May 2, 1989.

At the outset of the trial, the Debtor moved for a default judgment against Roguski and the Residents, claiming that he had served them pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7004(b)(1) by mailing copies of the Complaint to them at Memphis St. (the copies mailed to the Residents addressed to them as "Occupants") and that they had not answered nor ap-

---

1. Throughout the litigation of Carondolet's motion for relief from the automatic stay and this litigation, the Debtor has attempted to press this court to allow the Debtor to remain in Aramingo Ave., at least until he completes this litigation and obtains possession of Memphis St.

peared. The Debtor and two members of the Mortgagee's Board of Directors, Frank S. Putnick (hereinafter "Putnick") and Frank Francek (hereinafter "Francek"), testified at trial.

At the close of the trial, we entered an Order of May 3, 1989, denying the entry of defaults against Roguski and the Residents and directing the Debtor and the Mortgagee to file Briefs addressing the issue of their rights *inter se* on or before May 16, 1989, and May 23, 1989, respectively. We refused to enter a default against Roguski because it was clear that Memphis St. was not his place of abode (since the Residents were living there) and there was no evidence that he conducted a business or profession there. With respect to the Residents, we expressed dismay that the Debtor, while urging this court to exercise its powers not to render him homeless, was apparently unconcerned about rendering the Residents homeless on the basis of a mailing sent to them as "Occupants." Hence, we concluded that the notice directed to all of these parties failed to comport with either B.Rule 7004(b)(1) or procedural due process of law.

When the Debtor's Brief failed to arrive on May 16, 1989, the court contacted his counsel, who only *then* requested an eight-day extension of the briefing.[2] The Mortgagee submitted a short Brief on May 23, 1989, which studiously avoided discussion of any of the legal issues and focused on the alleged improprieties of the Debtor's serial bankruptcy filings and the Debtor's goal of seeking to benefit himself instead of creditors in this proceeding. The Debtor's Brief arrived on May 24, 1989. We allowed the Mortgagee a week to respond to this belated offering. This evoked a short letter-reply of May 30, 1989, from the Mortgagee, contending that the Debtor's cause of action should be barred by laches. The Debtor's counsel saw fit to respond to

same with a two-page letter to the court, which we have not considered due to the impropriety of its submission. *See In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa. 1988).

Since this matter is an adversary proceeding, we are compelled to submit our decision in the form of Findings of Fact and Conclusions of Law. *See* B.Rule 7052 and Federal Rule of Civil Procedure 52(a). We shall do so, reciting each Conclusion of Law as a headnote of a pertinent legal Discussion where necessary.

## C. FINDINGS OF FACT

1. The Debtor and his ex-wife, DOROTHY N. PANAS (hereinafter "Dorothy"), purchased Memphis St., which apparently includes a storefront and a residence, on December 19, 1972, for $8,900.

2. On the date of the purchase, the Debtor and Dorothy, paying $2,000 down, executed a mortgage in the amount of $6,500, with a term of 15 years, and an interest rate of eight (8%) percent, in favor of the Mortgagee in order to finance this purchase. Payments, which apparently included an escrow for taxes, were slightly more than $100 per month.

3. The Debtor and Dorothy separated in 1981, at which time they were apparently current on the mortgage payments. Dorothy has shown no interest in returning to the Debtor or to residing in either the Memphis St. or the Aramingo Ave. properties since the separation.

4. After the separation, the Debtor began abusing alcohol and drugs, causing frequent and prolonged hospitalizations between 1982 and 1985. During this period, the Debtor admits that his behavior was totally irresponsible, although he credibly contends that he has not abused alcohol or drugs since 1985.[3]

---

2. The delay in submission of this case belies the Debtor's concern in expediting disposition of this matter before he is evicted from Memphis St. *See* page 4 n. 1 *supra.* Rather, the course of litigation surrounding the Debtor's two properties described herein represents a clearly excessive series of ingenious but dilatory proceed-

ings, which have exhausted our concern with the equities of the Debtor.

3. The Debtor is of course to be highly commended for accomplishment of the difficult task of overcoming such substance dependency. Unfortunately, the Debtor has repeatedly expressed the belief that, since he has effected this accom-

5. In early 1982, the Debtor closed a variety store which he maintained at Memphis St. and boarded up the premises. He had ceased making mortgage payments about a year before and never indicated any intention to return to the premises until summer, 1988. His residence, since 1982, was at all times at Aramingo Ave., which is located, per the Debtor, "about 100 yards" from the Memphis St. property.

6. On March 7, 1983, the Mortgagee sent a Notice of Intention to Foreclose Mortgage to the Debtor and Dorothy at Aramingo Ave. The letter stated that the mortgagors "have not made the monthly payments of $2,308.84" because of an alleged delinquency since April, 1981, and, with late charges of $44.25, were required to pay a total of $2,353.09 to cure the default. No explanation of how to compute the amount due as of any particular month was included. There is no evidence that copies of the letter were sent to the Debtor or Dorothy addressed to Memphis St.

7. In June, 1983, Putnick, while on other business, passed by the Memphis St. premises and observed that the rear door was open. He entered the premises and therein saw rubbish and broken windows which strongly suggested that the premises had been vandalized.

8. Francek, then the Mortgagee's President, having received a report of these observations from Putnick, visited Memphis St. and inspected it in more detail. He observed broken windows and that the premises was full of rubbish throughout and stripped of copper pipes, and thus concluded that it was uninhabitable.

9. Several days later, apparently still in June, 1983, Francek was approached by Roguski, who Francek testified spoke very little English but communicated an interest in obtaining a place to live. Francek and Roguski thereupon entered into an oral agreement whereby Roguski was to pay $50 monthly "rent" to the Mortgagee and fix up the property and, in return, was permitted by the Mortgagee to live in the premises indefinitely.

10. Francek testified that he observed, in later visits to the premises, that Roguski had completely rehabilitated it and also stated that he had faithfully paid the $50 monthly for over five years. However, the parties agreed that Roguski had since moved to New Jersey and was apparently sub-letting Memphis St. to the Residents on unknown terms.

11. In summer, 1988, the Debtor entered the premises and attempted to change the locks, but Roguski thereafter re-entered the premises and re-changed the locks to exclude the Debtor. Thereafter, the Debtor made no other attempt to regain possession of the premises until he filed this lawsuit.

12. The Debtor agreed that Roguski had made significant repairs to the premises. Largely as a result thereof, he stated that he believed that the present value of Memphis St. had risen to between $25,000 and $35,000.

13. The parties agreed, for purposes of this proceeding, that, pursuant to the parties' mortgage, the Debtor owed the Mortgagee $3,370.25 principal, $2,474.24 for an escrow deficit, and interest on the unpaid principal, which would apparently be a sum between $2,000 and $3,000.[4] The Mortgagee's secured proof of claim is therefore likely to be between $8,000 and $9,000. *But see* page 14 n. 9 *infra*.

14. The Debtor testified that, since filing this bankruptcy case, he has been regularly employed as a bus driver and has made payments of $250 monthly into escrow with his counsel. He testified that he plans to pay the Mortgagee a lump sum of about $2,700 in funds received from the Trustee from his prior bankruptcy and escrowed with counsel. Thereafter, he

---

plishment, his mortgagees owe him forbearance from payments during his prior periods of dependency. This misplaced mind-set appears, in his mind, to justify the excessive legal maneuvers made on his behalf.

4. Eight (8%) percent of the balance of $3,370.25 over the eight years of delinquency since 1981 would compute to $2,056.80. It is unclear whether any other sums are due, including interest on the escrow deficit or late charges.

planned to continue to pay the Mortgagee $250 monthly until its claims were satisfied.[5]

## D. CONCLUSIONS OF LAW/DISCUSSION

1. As this is a proceeding in which the Debtor seeks the turnover of specific property to his estate, it is a core proceeding which we can both hear and determine.

The Debtor's cause of action is expressly based upon 11 U.S.C. § 542(a), which provides as follows:

§ 542. Turnover of property to the estate

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

There is little doubt that the Memphis St. premises, being realty co-titled to the Debtor, is property of his estate which the Debtor can recover if he provides adequate protection to the Mortgagee, as required by 11 U.S.C. § 363(e). *See, e.g., In re Koresko,* 91 B.R. 689, 694–96 (Bankr.E.D.Pa.1988); *In re Ford,* 78 B.R. 729, 734–36 (Bankr.E.D.Pa.1987); *In re Attinello,* 38 B.R. 609, 610–13 (Bankr.E.D.Pa.1984); and *In re Robinson,* 36 B.R. 35, 37–38 (Bankr.E.D.Ark.1983). *Cf. United States v. Whiting Pools, Inc.,* 462 U.S. 198, 202–209, 211–12, 103 S.Ct. 2309, 2312–16, 2316–17, 76 L.Ed.2d 515 (1983).

---

**5.** Since the Plan appears to contemplate payments to the Trustee for 60 months, these payments would generate over $16,000, which would clearly appear to be sufficient to satisfy any proof of claim filed by the Mortgagee. *But see* page 14 n. 9 *infra.*

**6.** The rather lame explanation for the failure to do so proffered by the Mortgagee's counsel was

A proceeding seeking a turnover of specific property of the estate is expressly made a core proceeding by 28 U.S.C. § 157(b)(2)(E). Therefore, this is a matter which we not only must hear, but also must determine. *See* 28 U.S.C. § 157(b)(1).

2. Under the law of Pennsylvania prior to the enactment of Act No. 6 of 1974, 41 P.S. § 101, *et seq.* (hereinafter "Act 6"), a mortgagee had an absolute right to peaceful possession of a mortgaged property, at least upon the mortgagor's default in payment.

The unusual aspect of this proceeding is that the Mortgagee, for reasons which are not entirely clear, has never filed any action to foreclose upon the Debtor's and/or Dorothy's title-interest in the premises.[6] Rather, it has asserted its rights strictly in the capacity of a "mortgagee in possession" of the premises.

Unfortunately, neither party has undertaken to analyze the rights of a mortgagee in possession, which we believe is crucial to resolution of this proceeding. We nevertheless believe that it is important to measure the impact of Act 6 upon the law of Pennsylvania relative to the rights of mortgagees in possession as it existed prior to the enactment of Act 6, because the instant mortgage is subject to that Act. *See* 41 P.S. §§ 101 (definition of "Residential mortgage") and 403(a). We begin by analyzing the law as it existed prior to the enactment of Act 6.

The early Pennsylvania cases appear to be consistent with the common law rule that, "[i]n the absence of a stipulation or agreement to the contrary, ... a mortgagee is entitled by virtue of his legal title to immediate possession, on the execution of the mortgage, to the premises mortgaged" until the mortgage is liquidated. 55 A.L.R.2d 309 (1971). *See, e.g., Tryon v. Mun-*

---

that the Mortgagee was precluded from doing so by the automatic stays arising from the Debtor's various bankruptcies. Of course, the Mortgagee, as did Carondolet in reference to the Aramingo Ave. property, could have proceeded to obtain relief from the automatic stays pursuant to 11 U.S.C. § 362(d) and then have proceeded with foreclosure.

*son,* 77 Pa. 250, 262 (1875) ("The mortgage passes to the mortgagee the title and right of possession to hold till payment shall be made."); and Comment, *The Mortgage Theory of Pennsylvania,* U.PA.L.REV. 43, 49 (1924). Therefore, under the common law of Pennsylvania as it existed prior to 1974, a mortgagee, in the absence of a provision in the mortgage to the contrary,[7] was at all times entitled to possession until the mortgage was liquidated, even prior to or in the absence of a default in payment.

This rule sounds strange in our ears today.[8] By the twentieth century, the rule seems to have been softened by the principle that the mortgagor is entitled to possession unless he defaults under the mortgage. *See, e.g., Stephens v. Reed,* 121 F.2d 696, 699 (3d Cir.1941); and *In re H.K. Porter Co.,* 24 F.Supp. 766, 767 (W.D.Pa. 1938). Finally, later cases emphasize that the mortgagee may take possession only if it can do so peaceably, and that the mortgagee must otherwise bring an ejectment action to dispossess the mortgagor. *See Peoples–Pittsburgh Trust Co. v. Henshaw,* 141 Pa.Super. 585, 590, 15 A.2d 711, 714 (1940); and 3 STANDARD PA. PRAC.2d 438 (1976). Even more recent authority indicates that a mortgagee in possession must have the consent of the mortgagor in order to have the right to take possession of the mortgaged premises. *See Myers–Macomber Engineers v. M.L.W. Construction Corp.,* 271 Pa.Super. 484, 488–89, 414 A.2d 357, 359 (1979).

However, it does seem clear that, if a mortgagor defaults, and the mortgagee can obtain possession peaceably or consensually, the mortgagee, in transactions outside of the scope of Act 6, is entitled to do so without instituting any sort of legal process or sending any particular type of notice to the mortgagor.

Once in possession, the mortgagee is entitled to collect rents and profits subject to the duties of accounting for same to the mortgagor and applying these payments towards the mortgage indebtedness.[9] *See Stephens, supra,* 121 F.2d at 699; *Elliott v. Moffett,* 365 Pa. 247, 250–51, 74 A.2d 164, 166 (1950); *David Oil Co. v. Fogle,* 354 Pa. 150, 151, 47 A.2d 209, 209 (1946); *Winthrop v. Arthur W. Binns, Inc.,* 160 Pa.Super. 214, 216, 50 A.2d 718, 719 (1947); 55 A.L.R.2d, *supra,* at 333; and Annot., *Right of Mortgagee Lawfully in Possession, or One Entitled to His Rights, to Retain Possession Until Debt is Paid, Although Debt or Right to Foreclose Is Barred by Limitation,* 115 A.L.R. 339, 339 (1938). However, the mortgagee is entitled to remain in possession until the entire mortgage debt is paid. *See David Oil, supra,* 354 Pa. at 151, 47 A.2d at 209; *Winthrop, supra,* 160 Pa.Super. at 216, 50 A.2d at 719; 55 A.L.R.2d, *supra,* at 333; and Annot., *supra,* 115 A.L.R. at 339. Thus, a mortgagor whose mortgagee is in possession has a right to redeem the premises by paying off the mortgage indebtedness. Nevertheless, it is obviously difficult to unseat a mortgagee in possession once same becomes entrenched.

Therefore, under the law of Pennsylvania as it existed prior to Act 6, or still exists in transactions not within the scope of that Act, the Mortgagee here would

---

**7.** The instant mortgage provides that the mortgagor has a right "to have and to hold" the premises, which accords the mortgagor a right to possession unless and until a default occurs. However, it also states that, upon "any default in the payment of the obligation secured hereby" the Mortgagee may "take possession of and rent the premises and, after deducting all costs of collection, and administration, to apply the balance of the rents received on account of the obligation of the Mortgagors."

**8.** This rule sounds harsh to even the authors of the Pennsylvania Law Encyclopedia, who state that, although this is "apparently" the rule, "it is the universal practice for the mortgagor to re-

main in possession until default, ..." 24 P.L.E. 554 (1960).

**9.** Of possible ultimate pertinency here are the following principles: (1) The fair rental value for which the mortgagor must be credited is measured by the condition of the premises when the mortgagee comes into possession, without considering the enhancement in rental value from improvements thereafter by the mortgagee. 55 A.L.R.2d, *supra,* at 337; and (2) The mortgagee is entitled to an allowance on account of "permanent and useful improvements" which "are required for the preservation and beneficial occupancy of the property." *Id.* at 339.

have clearly been within its rights in taking possession of the premises. While having a duty to collect rents and apply same to the mortgage indebtedness, the Mortgagee would be obliged to relinquish possession only after the Debtor had received sufficient credit to liquidate, or otherwise paid off, the mortgage.[10]

3. Act 6 requires that a mortgagee provide notice in accordance therewith prior to having any right to take possession of a mortgaged premises. However, as the Debtor here abandoned the premises, he was not entitled to receive an Act 6 notice.

The Debtor argues, and we think correctly, that the right of a mortgagee to take possession of a premises as to a transaction within the scope of that Act are subject to and altered by the notice requirements of Act 6. The Act provides, in pertinent part, at 41 P.S. § 403(a), that "[b]efore any residential mortgage lender may ... take possession of any security of the residential mortgage debtor for such residential mortgage obligation," a 30–day notice in conformity with 41 P.S. § 403(c) must be sent to the mortgagor in the manner described in 41 P.S. § 403(b). Therefore, the power of a mortgagee to seize possession of the mortgaged premises is softened, as to transactions within its scope, by the requirement of Act 6 that any such seizure must be preceded by a specific form of notice. Taken together with the developments in the Pennsylvania common law requiring a mortgagee seeking possession to file an ejectment action in the event that it cannot obtain possession of the mortgaged premises peaceably, Act 6 would appear to require notice and a successful foreclosure action as prerequisites to dispossession of a residential mortgagor by a mortgagee. Furthermore, any attempt at a "self-help foreclosure" would appear to be repugnant to procedural due process of law. *Cf. In re C & C TV & Appliance, Inc.*, 97 B.R. 782, 788 (Bankr.E.D.Pa.1989);

and *In re Adams*, 65 B.R. 646, 649–50 (Bankr.E.D.Pa.1986).

■ The Mortgagee here did, however, precede its taking possession of the Memphis St. premises in June, 1983, with a letter of March 7, 1983, which purportedly complied with the requirements of Act 6. The Debtor counters the significance of this fact by observing that the notice (1) failed to include a formula to allow the Debtor (or Dorothy) to calculate the exact amount due, which we held to be a viable deficiency of the requirements of 41 P.S. § 403(c)(3) in *In re Mosley*, 85 B.R. 942, 951–54 (Bankr.E.D.Pa.1988); (2) mis-stated the amount of the monthly payment, actually about $100, by providing instead a figure for the monthly payment which appears to be the sum of all monthly payments then due, *i.e.*, $2,308.84; and (3) was not sent to the residence subject to the mortgage, as required by 41 P.S. § 403(b). *See In re Smith*, 866 F.2d 576, 586 (3d Cir.1989); and *In re Sharp*, 24 B.R. 817, 821 (Bankr.E.D.Pa.1982). Therefore, he argues that the letter of March 7, 1983, did not comply with Act 6 and is consequently of no legal significance.

These violations of the strict requirements of 41 P.S. § 403, or at least the last of them, may have been sufficiently substantial to have rendered the letter of March 7, 1983, ineffectual as a purported attempt at compliance with Act 6. *But see In re Vitelli*, 93 B.R. 889, 897–99 (Bankr.E. D.Pa.1988); and *Mosley, supra*, 85 B.R. at 951 n. 7 (a mortgagee's rights should not be significantly adversely affected by technical Act 6 violations).

However, we note that 41 P.S. § 403(d) provides that the notice required by § 403 "shall not be required where the residential mortgage debtor, has abandoned or voluntarily surrendered the property which is the subject of a residential mortgage." *See United States v. Spears*, 859 F.2d 284, 288 (3d Cir.1988). We recognize that abandonment of a leasehold interest in property

---

**10.** However, as Memphis St. appears to have been uninhabitable when the Mortgagee obtained possession, it may have had no rental value and the Debtor may have been obliged to

pay off the entire mortgage before regaining a right to possession of it. *See* page 14 n. *9 supra;* and *In re Fox*, 83 B.R. 290, 299–30 (Bankr.E.D. Pa.1988).

requires unequivocal actions of surrender of a premises or an expression of an intention of the resident to abandon the premises. *See Noble v. Bethlehem Housing Authority,* 617 F.Supp. 248, 249–50, 251 n. 5 (E.D.Pa.1985); *In re Adams,* 94 B.R. 838, 847 n. 4 (Bankr.E.D.Pa.1989); *Turnway Corp. v. Soffer,* 461 Pa. 447, 459–60, 336 A.2d 871, 877 (1975); and *Girolami v. Peoples Natural Gas Co.,* 365 Pa. 455, 76 A.2d 375, 377–78 (1950). However, we note that, in *In re West Pine Construction Co.,* 80 B.R. 315, 317, 323 (Bankr.E.D.Pa.1987), Chief Judge Twardowski of this court refused to "revive" a mining lease which he found "long dormant" when the debtor failed to pay royalties or conduct mining operations at the site for a period of less than two years.

Here, Dorothy vacated the premises in 1981, and the Debtor in early 1982. Mortgage payments ceased in early 1981. The March 7, 1983, letter, receipt of which the Debtor did not deny despite its defects, evoked no response. The premises was found to be grossly neglected and vandalized by the Mortgagee's Board members in June, 1983. The Mortgagee's security was thus left entirely at risk by the Debtor's extended departure from the Memphis St. premises. Furthermore, despite the fact that he was at most times after 1982 residing 100 yards away on Aramingo Ave., the Debtor raised no objection to the entry and residence in the property by Roguski until summer, 1988, five years after Roguski first took possession of it. In the intervening time, the Debtor had opposed, with excessive vigor, the efforts of Carondolet to displace him from Aramingo Ave. Chapter 13 Plans proposed by the Debtor featured reinstatement of the Carondolet mortgage, but were conspicuously absent of any effort on the part of the Debtor to regain possession of Memphis St. Only long after Roguski had rehabilitated Memphis St. and all of the Debtor's efforts to retain possession of Aramingo Ave., though successful in accomplishing delay, were winding down, did the Debtor turn his interest to the Memphis St. premises.

These facts, taken together, cause us to conclude that the Debtor abandoned this premises when he departed from it in early 1982. His course of conduct subsequent to 1982 is consistent with only such a conclusion. Although we are, as we expressed above, sensitive to the due process rights of mortgagors and would insist upon a "unequivocal act" of a mortgagor to forfeit his rights to possession where no court judgment terminating those rights has been entered, *cf. C & C, supra,* 97 B.R. at 788, the rather aggravated circumstances here constitute the rare case where we find that not one, but a whole series, of such "unequivocal acts" have occurred.

We therefore conclude that, despite the presence of the notice requirements of Act 6 as conditions for the Mortgagee to take possession of the Memphis St. premises, 41 P.S. § 403(d) of Act 6 excuses such notice here. Consequently, we find that the Mortgagee properly took possession of the premises and has properly retained same as a mortgagee in possession at all times to date, subject to the Debtor's right of redemption by liquidation of the mortgage balance.

4. The Debtor is nevertheless entitled to turnover of the Memphis St. premises to him as against the Mortgagee only, upon the performance of certain conditions necessary to adequately protect the Mortgagee.

■ Having determined that the Mortgagee rightfully took and retains possession of the premises does not, however, resolve this lawsuit in favor of the Mortgagee. In *Whiting Pools, supra,* the debtor was not contending that the Internal Revenue Service (hereinafter "IRS") wrongfully executed upon its property pursuant to a tax lien. Nor were the repossessions in issue in *Koresko, supra; Attinello, supra;* and *Robinson, supra* alleged to have been wrongful. However, since the property seized by the creditors in those cases was property of the debtors' respective estates, the debtors were deemed entitled to recover the property, subject of course to providing adequate protection to their respective secured creditors.

Moreover, the debtors in those cases would not have been entitled, under applicable non-bankruptcy law, to immediate recovery of the property which they succeeded in having turned over to them. The IRS sought to sell the property in issue, unsuccessfully seeking to obtain a declaration that the automatic stay did not apply to its actions in order that it could proceed to do so. 462 U.S. at 200–01, 103 S.Ct. at 2311–12. The creditor in *Attinello* likewise sought relief from the stay to dispose of the debtor's repossessed tractor. 38 B.R. at 610, 613. Had neither the debtors in those cases sought turnovers, nor the creditors sought relief from the stays in those cases, stalemates would have developed. The creditors would, however, have had no obligation to return the property seized to the debtor unless the obligations of the debtors to them were fully liquidated.

The circumstances here are similar. The Debtor remains as a co-owner of the premises.[11] Clearly, it is property of his estate and he can successfully promulgate a Chapter Plan of Reorganization to preserve his interests therein. *See In re Crompton,* 73 B.R. 800 (Bankr.E.D.Pa.1987); and *In re Jablonski,* 70 B.R. 381 (Bankr.E.D.Pa. 1987), *aff'd,* 88 B.R. 652 (E.D.Pa.1988). While the Debtor would not, pursuant to applicable non-bankruptcy law, be entitled to possession of the premises until the secured obligation is fully liquidated, he may, by the medium of a Plan and other performances designated by the court, *see In re Mitchell,* 75 B.R. 593, 598–600 (Bankr.E. D.Pa.1987), be found to adequately protect the Mortgagee's interests in the premises to the extent that an immediate right to possess the premises, at least vis-a-vis the Mortgagee, may be provided to him.

We emphasize that this holding will be only vis-a-vis the Mortgagee. The absence of proper service upon them deprives us of jurisdiction over Roguski or the Residents. We are also disinclined to ultimately resolve the issue of right to possession qua the Debtor and these individuals. Certainly, we would not do so unless Roguski and the Residents had a full and complete opportunity to assert their defenses. The Philadelphia Municipal Court appears to provide a forum wherein the Debtor can quickly assert his possessory rights against these individuals.

The burden is upon the Debtor to establish that the protection which he proposes to provide to the Mortgagee is adequate to protect its interests. *See, e.g., In re Wisconsin Barge Line, Inc.,* 69 B.R. 16, 19 (Bankr.E.D.Mo.1986); and *In re Weiss–Wolf, Inc.,* 60 B.R. 969, 975 (Bankr.S.D.N. Y.1986).[12] While we share the Mortgagee's skepticism that the Debtor will, after all of these years of neglect of the Memphis St. premises, perform his obligations to it in reference to this premises, we shall require very specific performances from him to attempt to assure same.

There is, of course, an aura of uncertainty as to what will constitute a full performance by the Debtor, because the Mortgagee has not yet filed a proof of claim[13] and there are several unusual variables which could affect same. See page 14 n. 9 *supra.* However, the parties stipulated to a likely claim of the Mortgagee in the $8,000 to $9,000 range for purposes of resolving this proceeding. The Debtor's proposal to pay in excess of $16,000 certainly would appear adequately qualified to protect a claim in this amount.

Some qualitative aspects of the Debtor's performance must, however, be spelled out.

11. The fact that Dorothy is also a co-owner is irrelevant in determining the Debtor's rights vis-a-vis the Mortgagee. It appears that Dorothy is equally entitled to possession or partition rights with respect to the realty. The Debtor's redemption of the property revives her otherwise vanquished rights in the premises. The Debtor's undertakings are, therefore, if anything, a windfall to her.

12. These two cases are the only authorities cited by the Mortgagee in its submissions to this court in support of its position. Needless to say, many other relevant issues were totally neglected in its submissions.

13. The meeting of creditors is not scheduled to be held until June 30, 1989, rendering September 28, 1989, the bar date for filing claims. The confirmation hearing is not initially scheduled until October 10, 1989.

We will require that the Debtor remit, before he is entitled to possession, the $2,700 which he claims to have available to him. If the Debtor has not received the portion of this sum which was to constitute a refund from his payments in Bankr. No. 85–03208G, we will direct the Chapter 13 Trustee to remit this refund directly to the Mortgagee as a means of further assuring payment to it. We will also direct the Debtor to continue paying $250 monthly to the Mortgagee pending confirmation of a Chapter 13 Plan of Reorganization. With these conditions imposed, the Mortgagee will, in our opinion, be adequately protected. It might even be contended that the Mortgagee is enjoying a short-range windfall, as its monthly income from the property thereafter will be quintupled from $50 to $250. Without obtaining title through foreclosure, it is difficult for us to see how the Mortgagee could have realized any more from this property in the long range. On the whole, it should be pleased at the prospect of getting a troublesome account paid off and out of its portfolio.[14]

We therefore conclude that, under the conditions we will set forth, the Mortgagee will be adequately protected. Consequently, under these conditions the Debtor is entitled to possession of the Memphis St. premises under 11 U.S.C. § 542(a) as against the Mortgagee.

5. Since the Mortgagee will be entitled to possession of the premises until the conditions set forth are met, its retention of the premises was not heretofore violative of the automatic stay.

Since we have determined that the Mortgagee rightfully obtained and presently retains possession of the Memphis St. premises and is entitled to continue to do so pending receipt of certain payments from the Debtor, we do not believe that its actions were wrongful, contemptuous, or violative of the automatic stay.

The Debtor appears to contend that, since the Mortgagee refused to adhere to his unilateral demand to turn the property back over to him, it violated the automatic stay. However, until this court determined herein that the protection tendered to the Mortgagee by the Debtor was indeed adequate, the Mortgagee was not obliged to capitulate and turn over the property. The claim of the Debtor in this regard is reminiscent of that which we recently rejected in *In re Orsa Associates, Inc., Orsa Associates, Inc. v. MBA Financial, Inc.*, 99 B.R. 609, 622–23 (Bankr.E.D.Pa.1989). There, the debtors argued that the creditor-defendant violated the automatic stay by refusing to capitulate to their demand to reconvey certain premises to them because the conveyances by which they obtained title were avoidable pursuant to 11 U.S.C. § 548. Similarly, here, especially since the equities do not uniformly lie with the Debtor, we believe that finding any actionable stay-violation remedies would be misplaced.[15]

---

**14.** The Mortgagee pleaded and briefly argued the defense of laches. Laches requires not only inexcusable delay by the party claiming rights, but also prejudice to the party invoking it as a result of the delay by the claimant. *See, e.g., EEOC v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 80–81, 84–85 (3d Cir.), *cert. dismissed*, 469 U.S. 925, 105 S.Ct. 307, 83 L.Ed.2d 241 (1984); and *Thomas P. Carney, Inc. v. School District of Philadelphia*, 633 F.Supp. 1273, 1283–84 (E.D.Pa.1986). Assuming without deciding that the Debtor's delays in asserting his rights were inexcusable, we find an absence of prejudice to the Mortgagee from this delay for several reasons. First, the Mortgagee has itself been contributorily responsible for holding the matter in limbo, since it never proceeded with foreclosure. Secondly, our order provides the Mortgagee with a dramatic increase in income from the property. Finally, the claims process provides the Mortgagee with a means to recover all damages of which it is entitled from the Debtor, plus interest for deferral of its obligation. See 11 U.S.C. § 1325(a)(5)(B)(ii); and *Crompton, supra*, 73 B.R. at 806–07.

**15.** We must confess, however, that we question whether the Mortgagee's action in taking possession of the premises, as well as its dispatch of the Act 6 notice on March 7, 1983, were violative of the automatic stay which arose in Bankr. No. 82–03779K. *See* page 2 *supra*. However, the Debtor has not raised this argument, possibly because he he did not adequately inform the Mortgagee of this filing. *But see, e.g., In re Clark*, 69 B.R. 885, 889–90, *modified*, 71 B.R. 747 (Bankr.E.D.Pa.1987) (automatic stay is imposed despite debtor's failure to assert same and the consequent ignorance of a creditor of its presence).

## E. CONCLUSION

An Order consistent with the conclusions of law reached in this Opinion will be entered.

### ORDER

AND NOW, this 7th day of June, 1989, after a trial of this proceeding on May 2, 1989, and upon consideration of the post-trial submissions of the parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Debtor and Plaintiff, JOHN F. PANAS, and against Defendant POLONIA FEDERAL SAVINGS & LOAN ASSOCIATION (hereinafter "Polonia") only.

2. The Debtor is entitled to quiet title and possession of the premises situated at 2901 Memphis St., Philadelphia, Pennsylvania (hereinafter "the Premises"), as to Polonia only, subject to the rights therein of Dorothy Panas and the other Defendants in this proceeding, upon the condition that the Debtor does the following:

   a. Remits the sum of $2,700 and any additional sum which he claims to have on account to Polonia. If the Chapter 13 Trustee is still holding any sums as refunds from Bankr. No. 85–03208G, the Debtor may deduct that sum from the $2,700, and the Chapter 13 Trustee is directed to remit that sum directly to Polonia within ten (10) days. Upon the remittance of the $2,700 and any additional sums held on account, the Debtor shall be entitled to possession of the premises as to Polonia only.

   b. Thereafter remits additional payments of $250 monthly, beginning in June, 1989, to Polonia on or before the 15th day of each month, pending confirmation of a Chapter 13 Plan of Reorganization.

   c. Maintains adequate fire insurance coverage for the Premises at all times that he is in possession and promptly pays all real estate taxes and water and sewer rental charges against the Premises in the year 1989 and thereafter.

3. All other relief requested by the Debtor from Polonia is DENIED.

4. The counterclaim of Polonia against the Debtor is DISMISSED without prejudice to Polonia to raise any claims against the Debtor in the claims process.

5. The hearing on Confirmation of the Debtor's Chapter Plan of Reorganization shall remain scheduled on

TUESDAY, OCTOBER 10, 1989, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

6. The Debtor shall file any Amended Plans or other pleadings necessary to assure confirmation in order that no continuances of the hearing date set forth herein are necessary, as no such requests will be entertained.